



FILED
2/18/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

PJJ

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

DANIEL BERGER,

      Plaintiff,

- v -             Case No. 2025-cv-13361

JORGE SÁNCHEZ,

      Defendant.

## PRELIMINARY STATEMENT, ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendant JORGE SÁNCHEZ ("Sánchez" or "Defendant"), by his undersigned, for his Preliminary Statement, Answer, Affirmative Defenses, and Counterclaims against plaintiff DANIEL BERGER ("Berger" or "Plaintiff"), states as follows:

## PRELIMINARY STATEMENT

**"AIDS obsession," "Sick person," "A[n HIV/AIDS] virus gone wrong in the head," "If I were to try to live amongst Palestinians, rest assured, I'd be beheaded," "All Palestinians should be killed."**

These series of recurring statements made by private collector Dr. Daniel Berger—who publicly portrays himself as a liberal humanitarian—reveals the animus, bias, projection, and false victimization that undergird this frivolous lawsuit. It is the same logic of fear, racism, domination, and silencing that animates Plaintiff's conduct toward Defendant and, more broadly, our unfortunate present moment.

This action is not a copyright dispute. It is a case about discrimination, retaliation, and the abuse of institutional and economic power to silence a scholar after he engaged in protected activity. Plaintiff Daniel Berger has attempted to reframe this dispute as a narrow disagreement over copyright ownership arising from an Editorial Services Contract. That framing is misleading.

The true gravamen of this case is Plaintiff's creation and maintenance of a hostile and discriminatory working environment directed at Defendant Jorge Sánchez, an openly Queer Puerto Rican scholar living with HIV, followed by retaliation when Defendant objected to that treatment and made protected complaints.

As detailed in Defendant's Answer, Affirmative Defenses, and Counterclaims, Plaintiff repeatedly subjected Defendant to HIV-based harassment, including derogatory comments characterizing Defendant's scholarship as an "AIDS obsession," calling Defendant a "sick person," and asserting that Defendant had "a virus gone wrong in the head." Plaintiff then attempted to censor and erase Defendant's scholarly contributions that referenced HIV/AIDS, threatened Defendant's career, and ultimately filed this lawsuit only days after Defendant made

formal protected complaints to museum leadership and engaged in protected whistleblower activity.

Plaintiff's copyright claims are not only legally unsound; they function as a pretextual and retaliatory mechanism to punish Defendant for opposing discrimination, asserting his rights, and refusing to allow his scholarship and identity to be erased. Copyright law may not be weaponized to chill protected speech, conceal discriminatory conduct, or retaliate against a person living with a disability who speaks out. Accordingly, this pleading responds to Plaintiff's allegations while making clear that the copyright issues Plaintiff foregrounds cannot be separated from the discriminatory and retaliatory conduct that gave rise to this dispute. Defendant's defenses and counterclaims arise from the same nucleus of facts: a pattern of discrimination, retaliation, and coercion that culminated in the filing of this lawsuit.

## FINAL PRELIMINARY CLARIFICATION REGARDING ALLEGED BREACH OF CONTRACT AND CONFIDENTIALITY

Plaintiff's repeated allegations that Defendant breached the Editorial Services Contract by disclosing information or asserting rights are legally defective and misstate the law. Defendant cannot, as a matter of law, be deemed in breach of contract for engaging in protected activity, including opposing unlawful discrimination, reporting violations of law, or making whistleblower disclosures. Any contractual provision purporting to bar such conduct is unenforceable as against public policy.

By contrast, Plaintiff materially breached the contract first by creating a hostile and discriminatory working environment, engaging in disability-based harassment, attempting to censor Defendant's scholarship because it referenced HIV/AIDS, threatening Defendant's

professional career, and retaliating against Defendant for protected complaints. Plaintiff's prior material breaches excuse any further performance by Defendant and bar Plaintiff from seeking relief under the contract. Defendant affirmatively states that any alleged disclosure constituted protected activity, including lawful whistleblower disclosures, protected opposition to discrimination, and communications necessary to prevent ongoing unlawful conduct. Such disclosures are expressly protected under New York Labor Law § 740, the NYCHRL, the NYSHRL, and analogous federal doctrines. Plaintiff may not transform protected activity into a contractual breach through artful pleading. Plaintiff's breaches were not minor or technical; they went to the heart of the contractual relationship by destroying the conditions under which Defendant could safely and lawfully perform his work. A party who creates a hostile, discriminatory, and retaliatory environment cannot invoke contract provisions to punish the victim of that conduct.

## ANSWER TO COMPLAINT
### ANSWER TO SUMMARY OF THE CASE

1.        In response to Paragraph 1 of the Complaint, Defendant admits that the parties executed an Editorial Services Contract in October 2023 (the "Original Contract"). Defendant denies that the project remained limited to the scope of the Original Contract. Defendant states that the project fundamentally transformed in late 2023 and into 2024 from a basic editorial services contract for a simple catalog (the "Original Rebel" project) into a substantially and materially different, co-conceived, co-developed, and co-authored scholarly publication titled *Rebel: Queer, Black, and Activist Art* (the "New Rebel Project" or "Rebel"). The scope of work materially changed without amending the compensation or the contract itself. Defendant became not merely an editor but a co-creator, co-author, and co-developer of Rebel, contributing original authorship

well beyond the narrow editorial services contemplated in the Original Contract. Defendant further denies that Plaintiff commissioned or paid for these additional original works of authorship. Defendant further denies the remaining allegations in Paragraph 1. **Defendant further states that this action does not arise from the execution of the Original Contract, but instead arises from a hostile work environment and Plaintiff's retaliatory conduct following Defendant's protected complaints of discrimination to the Co-producer of the book, the Leslie Lohman Museum of Art.** Defendant denies the remaining allegations in Paragraph 1.

2.         In response to Paragraph 2 of the Complaint, Defendant denies that Plaintiff is entitled to the relief sought. Defendant specifically denies that Plaintiff has any copyright interest in Defendant's original co-authored contributions to the New Rebel Project, which fall outside the scope of the Original Contract. Defendant further states that Plaintiff's request for declaratory relief and damages is part of a retaliatory effort to extinguish Defendant's authorship and professional credit following Defendant's protected complaints regarding discrimination and a hostile work environment. Defendant denies the remaining allegations in Paragraph 2.

## ANSWER TO PARTIES, JURISDICTION, AND VENUE

3.         Defendant admits the allegations in Paragraph 3.

4.         Defendant admits the allegations in Paragraph 4.

5.         Defendant denies that this action arises under the Copyright Act, 17 U.S.C. § 101 et seq., or otherwise presents a substantial federal question sufficient to confer jurisdiction under 28 U.S.C. § 1331. Defendant states that Plaintiff's claims are, in substance, state-law contract and employment-related disputes improperly repackaged as a federal copyright action in retaliation for Defendant's protected complaints of discrimination. Defendant further states that any alleged

copyright issues are incidental and do not confer original federal jurisdiction. In the alternative, and without conceding subject matter jurisdiction, Defendant states that to the extent this Court were to find jurisdiction under 28 U.S.C. § 1331, Defendant's claims and defenses arise under federal and state law, including the Copyright Act, 17 U.S.C. § 101 et seq., the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq., the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq., and New York Labor Law § 740.

6.        In response to Paragraph 6, Defendant states that Plaintiff's jurisdictional allegations are asserted solely to manufacture diversity jurisdiction in an improper forum.

7.        In response to Paragraph 7 of the Complaint, Defendant denies that this Court has personal jurisdiction over him. Defendant denies that he conducts business in Illinois in connection with the acts giving rise to this lawsuit, denies that he has sufficient minimum contacts with Illinois, and denies that he purposefully availed himself of the privilege of conducting business in Illinois. Defendant further denies that a contractual choice-of-law provision, standing alone, confers personal jurisdiction, and denies that any alleged promotion, marketing, or provision of services to Plaintiff in Illinois constitutes purposeful availment under constitutional due process standards. Defendant states that the operative facts underlying this dispute occurred primarily in New York, where Defendant is based and where the professional relationship was centered. Plaintiff would regularly travel to conduct business in New York with Defendant at Phaidon Press headquarters as well as the Leslie Lohman Museum of Art. Plaintiff's unilateral residence in Illinois is insufficient to establish personal jurisdiction.

Defendant further states that the filing of this action in Illinois, rather than in New York where related discrimination and retaliation claims arise and where the locus of operative facts

exists, reflects impermissible forum shopping designed to obtain tactical advantage and to interfere with Defendant's protected activity. The exercise of personal jurisdiction in Illinois would offend traditional notions of fair play and substantial justice. Defendant denies the remaining allegations of Paragraph 7.

8.        In response to Paragraph 8 of the Complaint, Defendant denies that venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendant denies that a substantial part of the acts or omissions giving rise to the present dispute occurred in the Northern District of Illinois, and denies that Plaintiff's residence alone is sufficient to establish venue.

Defendant states that the operative facts underlying this dispute occurred in New York, where Defendant is based and where the professional relationship was centered. Defendant would regularly commute to New York where he performed substantial work on the New Rebel Project, including work for the Leslie-Lohman Museum of Art ("LLMA"), and Phaidon Press, and because Plaintiff directed much of his discriminatory and retaliatory conduct toward Defendant in New York. Illinois is not the proper venue for this dispute. Defendant further states that Plaintiff's selection of this District reflects impermissible forum shopping designed to obtain tactical advantage and to shield Plaintiff from accountability for retaliatory conduct following Defendant's protected complaints of discrimination, which are about to be the subject of proceedings in New York. Defendant states that venue, if any, properly lies in the Southern District of New York. Defendant denies the remaining allegations of Paragraph 8.

### ANSWER TO BACKGROUND FACTUAL ALLEGATIONS

9.        In response to Paragraph 9 of the Complaint, Defendant admits that he holds a law degree, but denies that he is an attorney for purposes of the acts alleged in the Complaint. Defendant states

that he is a non-practicing lawyer, is not a copyright attorney, did not act in any legal capacity in connection with the matters at issue, and did not provide legal services to Plaintiff in connection with the project. Defendant further states that any attempt to characterize Defendant as having provided "services" in a legal or professional capacity misrepresents the relationship at issue and reflects the same underpaid and exploitative conditions created by Plaintiff, in which Defendant's substantive scholarly and creative labor was extracted without fair compensation or proper credit.

10.         In response to Paragraph 10 of the Complaint, Defendant denies that he alone prepared the Contract. Defendant states that the Original Contract was prepared jointly by Defendant, Camilo Godoy, and Plaintiff, and that it does not reflect a unilateral drafting by Defendant. Defendant further states that the project later transformed into the New Rebel Project, which involved materially different terms, scope, and authorship and was governed by separate agreements prepared by Phaidon Press.

Defendant states that Camilo Godoy, Plaintiff, and Phaidon Press are indispensable parties to this action, as they were directly involved in the preparation, negotiation, execution, and performance of the relevant agreements and are necessary to afford complete relief and to avoid inconsistent obligations. Defendant denies the remaining allegations of Paragraph 10.

11.    In response to Paragraph 11 of the Complaint, Defendant admits that an Editorial Services Contract was executed in or around October 2023 by Plaintiff, Defendant, Camilo Godoy, and Dan Berger. Defendant denies any characterization of Camilo Godoy or Dan Berger as mere "Non-Party Service Providers," and states that both were integral participants in the collaboration underlying the Original Contract and the subsequent New Rebel Project.

Defendant further states that he received a below-market editorial fee of approximately $7,000 for what was represented as limited editorial curation services under the Original Contract. However, the scope of work materially expanded beyond the original terms, and Defendant was paid only for editing while performing substantial writing, original scholarly authorship, and co-development of content without just compensation. Defendant further states that the mischaracterization of the parties' roles obscures the collaborative and co-authored nature of the project and the materially altered contractual relationships at issue. Defendant denies the remaining allegations in Paragraph 11.

**12.**         In response to Paragraph 12, Defendant admits that the Original Contract contemplated certain limited editorial services as listed. However, Defendant denies that his work was limited to these services. Defendant states that in late 2023 and into 2024, the project transformed significantly into the New Rebel Project, with Defendant co-conceiving the title for the project, developing the curatorial framing, developing the thematic structure of what became the book (including the substantive four-chapter conversations that were recorded), developing the book's conceptual framework, creating the editorial structure, and writing substantial portions of the book—which involved independently selected, arranged, and framed materials, and authoring the Editors' Introduction. Defendant also organized, participated in, and spoke in a series of recorded conversations that were later transcribed, edited, and excerpted for publication. These four-chapter conversations are a substantive portion of the New Rebel Project. Defendant selected the contributors, planned the conversations which included writing the interview prompts and conversation scripts. Defendant also had spoken contributions from these recordings which are quoted, edited, and contextualized within the book. All of these contributions were new and original scholarly co-authorship contributions not covered by the Original Contract.

13.         Defendant denies the allegations in Paragraph 13 to the extent they suggest Defendant improperly disclosed confidential information. Defendant states that he made protected disclosures and complaints concerning Plaintiff's unlawful conduct, including violations of copyright law, disability discrimination, retaliation, and violations of nonprofit governance law. Such disclosures are protected under New York's whistleblower law, N.Y. Lab. Law § 740, and federal and state anti-discrimination laws. Defendant affirmatively states that any alleged disclosure constituted protected activity, including lawful whistleblower disclosures, protected opposition to discrimination, and communications necessary to prevent ongoing unlawful conduct. Such disclosures are expressly protected under New York Labor Law § 740,

the NYCHRL, the NYSHRL, and analogous federal doctrines. Plaintiff may not transform protected activity into a contractual breach through artful pleading.

14.        In response to Paragraph 14 of the Complaint, Defendant admits that the Original Contract contained language stating that Plaintiff would retain "all rights and ownership of the content" and that Defendant "will not claim ownership or copyright over any of the content," as those provisions were drafted in connection with a narrow, preliminary catalog project and limited editorial curation services only. Defendant denies that this language applies to the New Rebel Project or to Defendant's original works of authorship created outside the scope of the Original Contract. Defendant further states that the Original Contract did not constitute, and nowhere purports to constitute, a valid work-for-hire agreement under 17 U.S.C. § 101, nor does it contain the statutory language necessary to divest Defendant of copyright in original works of authorship created beyond the limited editorial services contemplated at the time of execution.

Defendant states that the New Rebel Project was a fundamentally transformed and materially different project involving substantial original authorship, co-development, and scholarly creation by Defendant, including but not limited to the Editors' Introduction, chapter frameworks, conceptual architecture, and Defendant's authored and spoken contributions to recorded conversations. Defendant further states that to the extent the cited contractual language is asserted to apply beyond the narrow original scope, it is ambiguous, overbroad, and unenforceable as applied to later-created works, and cannot be used to appropriate Defendant's independent authorship without just compensation or consent. Defendant retains copyright in his original contributions to the New Rebel Project. Defendant denies the remaining allegations in Paragraph 14.

15.        In response to Paragraph 15 of the Complaint, Defendant admits that the Original Contract contained a provision stating that it would be governed by and construed in accordance with Illinois law. Defendant denies that this provision governs the New Rebel Project or any subsequent agreements, including those involving Phaidon Press, or Defendant's original works of authorship created outside the scope of the Original Contract. Defendant further states that a contractual choice-of-law provision does not constitute consent to personal jurisdiction or venue in Illinois, nor does it govern independent statutory claims, including claims arising under federal copyright law or New York anti-discrimination and whistleblower statutes. Defendant denies the remaining allegations of Paragraph 15.

16.        In response to Paragraph 16 of the Complaint, Defendant admits that the Original Contract contained an integration clause stating that it represented the entire agreement between the parties with respect to the narrow, preliminary catalog project contemplated at the time of execution. Defendant denies that the Original Contract constituted the entire agreement governing the New Rebel Project, which emerged subsequently in late 2023 and into 2024 as a fundamentally different project involving materially expanded scope, substantial additional work, and original scholarly authorship by Defendant that was neither contemplated by nor compensated under the Original Contract. Defendant further states that the parties' subsequent course of performance, conduct, and agreements—including collaboration with additional parties and a separate publisher—modified and superseded the Original Contract as to the New Rebel Project, rendering the integration clause inapplicable to later-created works and obligations. Defendant denies the remaining allegations of Paragraph 16.

17.        In response to Paragraph 17 of the Complaint, Defendant denies that Plaintiff is entitled to indemnification as alleged. Defendant admits that the Original Contract contained an indemnification provision limited to liabilities arising from Defendant's work within the narrow scope of the original catalog project. Defendant denies that the provision applies to the New Rebel Project or to Defendant's original works of authorship created outside the scope of the Original Contract. Defendant further states that the indemnification provision does not, and as a matter of law cannot, require Defendant to indemnify Plaintiff for Plaintiff's own breaches of contract, unlawful conduct, discriminatory acts, retaliatory conduct, or the creation of a hostile work environment. Any interpretation that would require Defendant to indemnify Plaintiff for liabilities arising from Plaintiff's own intentional or statutory violations—including discrimination or retaliation—would be contrary to public policy and unenforceable as applied. Defendant denies the remaining allegations of Paragraph 17.

18.        In response to Paragraph 18 of the Complaint, Defendant admits that he and Camilo Godoy performed limited editorial services under the Original Contract in connection with the narrow original catalog project. Defendant denies that all work performed constituted "Services" within the meaning of the Original Contract and denies that the Contract governed the full scope of work performed in connection with the Book as ultimately conceived and produced. Defendant further states that, in connection with the New Rebel Project, he performed substantial additional work far beyond the scope of the Original Contract, including original scholarly writing, authorship, co-development of the book's conceptual and structural framework, and substantive spoken contributions incorporated into the Book, none of which were contemplated by or compensated under the Original Contract. Defendant further states that Plaintiff's attempt to characterize Defendant's original authorship and intellectual labor as mere "services"

misrepresents the nature of the work performed and improperly conceals the involvement of additional indispensable parties, including Camilo Godoy and the Leslie-Lohman Museum of Art, for whom work was performed and whose rights, obligations, and interests are directly implicated by the New Rebel Project. Defendant denies the remaining allegations of Paragraph 18.

19. In response to Paragraph 19 of the Complaint, Defendant admits that certain limited editorial services under the Original Contract involved consultation with Plaintiff regarding selections for the narrow original catalog project. Defendant denies that such consultation governed, defined, or constrained Defendant's independent creative and scholarly contributions to the New Rebel Project, and denies that consultation converted Defendant's original authorship into work-for-hire or content owned by Plaintiff. Defendant further states that, in connection with the New Rebel Project, he exercised independent creative control over original works of authorship, including the Editors' Introduction, chapter frameworks, the book's conceptual architecture, conversation scripts, and his own authored and spoken contributions to recorded conversations incorporated into the Book. Defendant further states that consultation with Plaintiff does not negate authorship, originality, or ownership, and that collaborative discussion—particularly in a scholarly context—does not divest an author of copyright in independently created works. Defendant denies the remaining allegations of Paragraph 19.

**ANSWER TO FIRST CLAIM FOR RELIEF**

**DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201 and 2202**

20. In response to Paragraph 20 of the Complaint, Defendant incorporates by reference his responses to Paragraphs 1 through 19 as though fully set forth herein. To the extent Paragraph 20 is construed to incorporate any allegation not expressly admitted, Defendant denies the same.

**21.** In response to Paragraph 21 of the Complaint, Defendant denies the allegations and denies Plaintiff's characterization of the Book and/or the New Rebel Project as "a compilation" within the meaning of 17 U.S.C. § 101, to the extent Paragraph 21 asserts a legal conclusion. Defendant states that the New Rebel Project is a complex scholarly work involving substantial original authorship and creative expression by Defendant, including original written text, editorial and curatorial frameworks, conceptual architecture, and authored and spoken contributions incorporated into the manuscript. Defendant further states that Plaintiff's invocation of the term "compilation" is a litigation-driven mischaracterization designed to collapse Defendant's independent authorship into mere "selection" or "consultation," and to facilitate the appropriation and exploitation of Defendant's original scholarly labor without just compensation or proper credit.

In the alternative, and without conceding Plaintiff's characterization, Defendant states that even if the Book were deemed to include a compilation component, that characterization does not extinguish or transfer copyright in independently copyrightable original contributions, nor does it confer on Plaintiff ownership of Defendant's original works of authorship created outside the narrow scope of the Original Contract. Defendant denies the remaining allegations of Paragraph 21

**22.** In response to Paragraph 22 of the Complaint, Defendant denies the allegations and denies Plaintiff's characterization of Defendant's introductory essay and/or Editors' Introduction as a "supplementary work" within the meaning of 17 U.S.C. § 101, to the extent Paragraph 22 asserts a legal conclusion. Defendant states that the Editors' Introduction is a substantial, independently copyrightable original work of authorship authored by Defendant that sets forth the intellectual

and conceptual architecture of the New Rebel Project, including its central arguments, methodological framing, chapter logic, and editorial structure. Defendant further denies that the Editors' Introduction was "specially ordered or commissioned" as a supplementary contribution within the meaning of 17 U.S.C. § 101, denies that any valid work-for-hire arrangement exists as to that work, and denies that any contractual language in the Original Contract can be stretched to appropriate later-created authorship developed as part of a materially transformed, co-conceived, co-developed, and co-edited scholarly publication.

Defendant further states that Plaintiff's attempt to relabel the Editors' Introduction as "supplementary" is a litigation-driven mischaracterization designed to strip Defendant of authorship, ownership, and professional credit for the core intellectual framework of the book. Defendant retains copyright in the Editors' Introduction and other original contributions to the New Rebel Project. Defendant denies the remaining allegations of Paragraph 22

23.        In response to Paragraph 23 of the Complaint, Defendant admits that Plaintiff initially engaged Defendant to perform limited editorial and curatorial services under the Original Contract in connection with a narrow original catalog project. Defendant denies that Plaintiff "specifically commissioned" Defendant's substantial original scholarly authorship, conceptual development, or creative contributions to the New Rebel Project, and denies that the Original Contract governs the Book as ultimately conceived, structured, and produced. Defendant further states that the New Rebel Project emerged in late 2023 and into 2024 as a materially different, co-conceived, co-developed, and co-edited scholarly publication, in which Defendant exercised independent creative control and contributed original copyrightable authorship beyond any editing, selection, or arrangement contemplated by the Original Contract. Defendant denies that

Plaintiff paid for, or obtained ownership of, these additional original works of authorship, and denies the remaining allegations of Paragraph 23

24.    In response to Paragraph 24 of the Complaint, Defendant incorporates by reference his response to Paragraph 14 as though fully set forth herein. Defendant denies that Plaintiff may weaponize narrow boilerplate language from the Original Contract—drafted for a preliminary catalog project—to appropriate Defendant's later-created original scholarly authorship in the New Rebel Project. Defendant further denies that any valid work-for-hire arrangement exists or that Plaintiff commissioned or paid for Defendant's independent authored contributions beyond limited editorial services. Defendant further states that, to the extent the cited contractual language is asserted to apply beyond the narrow original scope, it is ambiguous, overbroad, and unenforceable as applied to later-created works, and cannot be used to divest Defendant of copyright in his independent authorship without consent or just compensation. Defendant denies the remaining allegations of Paragraph 24.

25.    In response to Paragraph 25 of the Complaint, Defendant denies the allegations and denies that the Contract constitutes a written "work made for hire" agreement under 17 U.S.C. § 101. Defendant states that Plaintiff's work-for-hire characterization is contrary to the text of the statute, contrary to the parties' relationship (which was not employment), and unsupported by any express work-for-hire language or qualifying commissioned-work category. Defendant further states that Plaintiff's invocation of "work made for hire" is a litigation-driven attempt to appropriate Defendant's independent scholarly authorship in the New Rebel Project without consent, credit, or just compensation. Defendant denies the remaining allegations of Paragraph 25.

26.  In response to Paragraph 26 of the Complaint, Defendant admits only that 17 U.S.C. § 201(b) states that, in the case of a valid work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of the Copyright Act, absent an express written agreement otherwise. Defendant denies that any work made for hire relationship exists here, denies that Defendant's original works of authorship contributed to the New Rebel Project constitute works made for hire, and denies that Plaintiff is the "author" or owner of Defendant's independent authored contributions. Defendant further states that the Original Contract does not contain any express "work made for hire" designation, does not satisfy the statutory prerequisites of 17 U.S.C. § 101 for commissioned works, and no separate written work-for-hire agreement exists. Defendant further states that Plaintiff's reliance on § 201(b) without any valid work-for-hire agreement is a litigation-driven mischaracterization that underscores the frivolous nature of Plaintiff's ownership claims. Defendant denies the remaining allegations of Paragraph 26

27.  In response to Paragraph 27 of the Complaint, Defendant denies the allegations and denies that Plaintiff is the "author" of Defendant's original works of authorship. Defendant denies that Defendant's contributions were "prepared for Plaintiff" within the meaning of the work-for-hire doctrine, and denies that Plaintiff can convert Defendant's independent authorship into work made for hire merely by labeling it "services" or by characterizing collaborative consultation as commissioning. Defendant further states that Defendant was not Plaintiff's employee; the Original Contract contains no express work-made-for-hire designation; no separate written work-for-hire agreement exists; and Defendant's later-created contributions to the New Rebel Project fall outside the narrow scope of the Original Contract. Defendant further states that Defendant's compensation was structured as independent contractor compensation, including the submission of invoices to

the Leslie-Lohman Museum of Art in connection with work performed for Rebel, and the issuance of payments as 1099 contractor compensation. Upon information and belief, Plaintiff commingled and routed funds through third parties and institutional accounts while continuing to characterize Defendant's independent authorship as "services," underscoring that no employment relationship—and no work-for-hire relationship—ever existed. Defendant states that Defendant's contributions constitute original copyrightable authorship created as part of a materially transformed, co-conceived, co-edited scholarly publication, and Defendant retains copyright in his original contributions. Defendant denies the remaining allegations of Paragraph 27

28.    In response to Paragraph 28 of the Complaint, Defendant denies the allegations and denies Plaintiff's characterization of the Contract and its effect on copyright ownership. Defendant admits only that the Original Contract contains language stating that Plaintiff would retain "all rights and ownership of the content" and that Defendant "will not claim ownership or copyright over any of the content," as those provisions were drafted for and limited to the narrow original catalog project contemplated at the time of execution. Defendant denies that the Original Contract—or any clause therein—constitutes a valid work-made-for-hire agreement, assignment, or transfer of Defendant's copyright in later-created original works of authorship contributed to the New Rebel Project. Defendant further states that the Contract contains no express "work made for hire" designation, no statutory compliance under 17 U.S.C. § 101, and no separate written instrument assigning Defendant's copyrights as required by 17 U.S.C. § 204. Defendant further states that to the extent Plaintiff asserts the cited language applies beyond the narrow original scope, it is ambiguous, overbroad, and unenforceable as applied to later-created works, and cannot be used to appropriate Defendant's independent authorship without consent or just compensation. Defendant retains

copyright in his original contributions to the New Rebel Project. Defendant denies the remaining allegations of Paragraph 28

29.        In response to Paragraph 29 of the Complaint, Defendant admits only that Plaintiff paid Defendant a limited editorial fee pursuant to the Original Contract for narrow editorial services associated with the original catalog project. Defendant denies that Plaintiff paid Defendant all amounts due pursuant to the terms of the Contract. Defendant states that additional amounts remain due and owing under the Contract and related agreements, including amounts withheld or not paid after Defendant made protected complaints of discrimination and Plaintiff engaged in retaliatory conduct.

Defendant further denies that Defendant was fully compensated for the materially expanded scope of work and original authorship Defendant contributed to the New Rebel Project, including substantial writing, original scholarly authorship, and co-development beyond the scope contemplated by the Original Contract. Defendant denies the remaining allegations of Paragraph 29.

30.        In response to Paragraph 30 of the Complaint, Defendant denies the allegations and denies Plaintiff's characterization of the Contract as "clear and unambiguous," denies that the Contract was "prepared by Defendant" as alleged, and denies that the cited provisions apply beyond the narrow original catalog project or govern the New Rebel Project. Defendant further denies that Plaintiff may rely on boilerplate language drafted for a preliminary catalog to appropriate Defendant's later-created original scholarly authorship and co-developed contributions to a materially transformed publication. Defendant further denies that Defendant's assertion of copyright interests in his original works of authorship is improper, and denies that

Defendant asserted claims "under the inapplicable Visual Artists Rights Act" as alleged. Defendant states that Defendant has consistently asserted rights under applicable federal and state law, including the Copyright Act, in connection with Defendant's independently copyrightable original contributions created outside the scope of the Original Contract and without a valid work-made-for-hire agreement or written assignment. Defendant further states that his authorship contributions include, inter alia, the Editors' Introduction and the book's conceptual and structural architecture, chapter frameworks, authored editorial text, and authored scripts, questions, prompts, and other original expression used to structure recorded conversations and interviews incorporated into the New Rebel Project. Defendant denies Plaintiff's insinuation that Defendant's contributions are limited to "services" jointly performed with others and denies that consultation or collaboration divests Defendant of copyright in independently created original expression.

Defendant further denies Plaintiff's mischaracterization of Defendant's position regarding interview and conversation materials. Defendant does not claim ownership of the words of other speakers merely because they appear in a transcript; rather, Defendant states that to the extent any transcripts, interview materials, or recorded conversations incorporate Defendant's authored prompts, structuring text, editorial shaping, selection, arrangement, and/or Defendant's own spoken contributions, Defendant retains copyright in his original expression and contributions.

Defendant denies the remaining allegations of Paragraph 30.

31.    In response to Paragraph 31 of the Complaint, Defendant denies the allegations and denies that he is barred by the Original Contract from asserting copyright ownership in his independently created original works of authorship. Defendant admits only that the Original Contract contained narrow language concerning ownership of "content" for a preliminary catalog

project as contemplated at the time of execution, but denies that such language applies to the New Rebel Project or to Defendant's later-created original contributions outside the scope of the Original Contract. Defendant further denies that the Original Contract constitutes a valid work-made-for-hire agreement under 17 U.S.C. § 101, and denies that any written assignment satisfying 17 U.S.C. § 204 exists transferring Defendant's copyrights to Plaintiff. Defendant further states that to the extent Plaintiff asserts the cited language applies beyond the narrow original scope, it is ambiguous, overbroad, and unenforceable as applied to later-created works, and cannot be used to divest Defendant of copyright in his independent authorship without consent or just compensation. Defendant retains copyright in his original contributions to the New Rebel Project. Defendant denies the remaining allegations of Paragraph 31.

32.      In response to Paragraph 32 of the Complaint, Defendant admits that Plaintiff purports to allege the existence of a controversy regarding copyright ownership, but denies Plaintiff's remaining allegations and denies that Plaintiff is entitled to the declaratory relief sought. Defendant denies that Plaintiff is entitled to any declaration that extinguishes or adjudicates away Defendant's independently created original works of authorship contributed to the New Rebel Project outside the scope of the Original Contract.

Defendant further states that Plaintiff's request for declaratory relief is overbroad and improperly seeks an advisory declaration untethered to a concrete, justiciable dispute over particular works and particular rights. Defendant further states that, to the extent any controversy exists, it arises from Plaintiff's attempt to mischaracterize Defendant's original authorship as mere "services" in order to appropriate Defendant's intellectual labor without fair compensation or proper credit,

including in retaliation for Defendant's protected complaints of discrimination and hostile treatment.

Defendant denies the remaining allegations of Paragraph 32.

33.    In response to Paragraph 33 of the Complaint, Defendant denies that Plaintiff is entitled to the relief requested. Defendant denies that Defendant's services or contributions to the Book were works made for hire, denies that Plaintiff owns Defendant's independently created original works of authorship, and denies that Plaintiff has the right to publish, exploit, or authorize publication of Defendant's original authored contributions to the New Rebel Project without Defendant's consent and without a valid work-made-for-hire agreement or written assignment satisfying 17 U.S.C. §§ 101 and 204.

Defendant further denies that any contractual language from the Original Contract—drafted for a narrow preliminary catalog project—governs the materially transformed New Rebel Project or divests Defendant of copyright in later-created works outside that limited scope. Defendant further states that to the extent Plaintiff seeks a declaration sweeping beyond the narrow original project, such request is overbroad, ambiguous, and improper as applied to later-created works and independent authorship.

Defendant denies the remaining allegations of Paragraph 33.

34.    In response to Paragraph 34 of the Complaint, Defendant denies that Plaintiff is entitled to the relief requested and denies Plaintiff's implied premise that Defendant's position

rests on claiming ownership of materials that neither were written by Defendant nor contain Defendant's words. Defendant states that Defendant does not claim ownership of the words of other speakers merely because they appear in a transcript.

Defendant further states that Plaintiff's "alternative" request is a litigation-driven attempt to engineer around Defendant's rights by stripping Defendant's authored expression—whether written or spoken—from the record so that the remaining materials can be published while Defendant's contribution is invisibilized. Defendant states that Defendant's authorship cannot be nullified by selective excision, redaction, or recharacterization, and that to the extent any interview materials, recorded conversations, and/or transcripts incorporate Defendant's original authored expression—including authored prompts, scripts, questions, editorial shaping, selection, arrangement, and/or Defendant's own spoken contributions—Defendant retains copyright in those original contributions and Plaintiff may not publish or exploit them without a valid written transfer or consent.

Defendant denies the remaining allegations of Paragraph 34.

## ANSWER TO SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

35.     In response to Paragraph 35 of the Complaint, Defendant incorporates by reference his responses to Paragraphs 1 through 34 as though fully set forth herein, and denies any allegations inconsistent therewith.

**Breach of Ownership and Copyrights Provision**

36.        In response to Paragraph 36 of the Complaint, Defendant denies the allegations. Defendant denies that he breached the Contract by asserting copyright interests in his independently created original works of authorship, including works created outside the narrow scope of the Original Contract and as part of the materially transformed New Rebel Project. Defendant further denies Plaintiff's characterization of the Contract as "clear and unambiguous," and denies that the Contract was "prepared by Defendant" as alleged.

Defendant states that the cited "ownership" language was drafted for and limited to a preliminary catalog project contemplated at the time of execution and does not constitute a valid work-made-for-hire agreement under 17 U.S.C. § 101 or a written assignment satisfying 17 U.S.C. § 204 as to Defendant's later-created authorship. To the extent Plaintiff asserts that clause applies beyond the narrow original scope, Defendant states that it is ambiguous, overbroad, and unenforceable as applied to later-created works and independent authorship.

Defendant further states that, even assuming arguendo that any contractual restriction could be construed to apply, Plaintiff materially breached the parties' contractual and professional relationship first, including by engaging in discriminatory and retaliatory conduct, creating a hostile work environment, attempting to suppress and censor Defendant's HIV/AIDS-related content and perspective, threatening Defendant's career and professional standing, withholding amounts due, and filing this action as retaliation for Defendant's protected complaints of discrimination. Plaintiff's breaches were not minor or technical; they went to the heart of the relationship by destroying the conditions under which Defendant could safely and lawfully perform his work. Plaintiff cannot weaponize the Contract to immunize himself from the

consequences of his own unlawful conduct. A party who manufactures a hostile, discriminatory, and retaliatory work environment—and then files suit to punish the target of protected complaints—cannot invoke contract provisions as a cudgel against the very person harmed by that conduct. Plaintiff's prior misconduct and material breaches excuse any further performance by Defendant and bar Plaintiff's recovery.

To the extent Plaintiff attempts to recast Defendant's protected complaints and necessary communications as a "breach" (including under any confidentiality provision), that characterization is pretextual and legally improper. Any alleged disclosure constituted protected activity, including lawful whistleblower disclosures, protected opposition to discrimination, and communications reasonably necessary to prevent, document, and remediate ongoing unlawful conduct. Such activity is protected under New York Labor Law § 740, the NYCHRL, the NYSHRL, and analogous federal doctrines, and Plaintiff may not transform protected activity into a contractual breach through artful pleading or retaliation-by-lawsuit. Defendant denies the remaining allegations of Paragraph 36.

### Breach of Confidentiality Provision

37. In response to Paragraph 37 of the Complaint, Defendant denies the allegations. Defendant denies that he violated any confidentiality obligation, denies that Plaintiff has accurately stated the nature, scope, or recipients of any alleged disclosures, and denies the asserted "15–20 persons" allegation as vague, inflated, and conclusory.

Defendant further states that, to the extent any communications occurred concerning the New Rebel Project, such communications were (i) made in good faith and on a need-to-know basis to

contributors, collaborators, and institutional stakeholders directly involved in the project; (ii) reasonably necessary to perform Defendant's role and to protect Defendant's authorship, credit, and contractual rights; and (iii) not "confidential" within the meaning of the Contract as applied to a materially transformed, multi-party collaborative publication involving additional indispensable parties and a publisher.

Plaintiff cannot weaponize a confidentiality clause as a gag order to conceal unlawful conduct or to punish protected activity. Defendant states that any alleged disclosures constituted protected activity, including lawful whistleblower disclosures, protected opposition to discrimination, and communications reasonably necessary to prevent, document, and remediate ongoing unlawful conduct. Defendant reasonably believed, based on the facts known to him, that Plaintiff was engaging in unlawful conduct, including misappropriation of Defendant's authorship and copyright rights, disability-based discrimination and retaliation, and misconduct implicating nonprofit governance and fiduciary obligations. Defendant's communications to institutional leadership and governance bodies associated with the project, to the publisher, and to contributors were made for legitimate purposes and are protected under New York Labor Law § 740, the NYCHRL, the NYSHRL, and analogous federal and state anti-retaliation doctrines.

Plaintiff may not transform protected activity into a contractual breach through artful pleading or retaliation-by-lawsuit. Defendant denies the remaining allegations of Paragraph 37.

**For context, the principal message referenced above stated as follows (verbatim):**

> "Dear collaborators,
> I am writing as the Co-Editor of Rebel: Queer, Black, and Activist
> Art to share an important update about the status of a project many
> of us have contributed to and care deeply about.

This project was presented from the outset as a committed scholarly collaboration, grounded in the participation of invited activists, artists, writers, and curators. Unfortunately, a series of deeply troubling developments have since taken place that now jeopardize the future of the publication:

**Hostile Conduct:** I was repeatedly told by Dr. Berger that my research — and I personally — had an "AIDS obsession" and that I was a "sick person" with "a virus gone wrong in the head." Such comments, as someone openly living with HIV, demean the legitimacy of my scholarship and have created a hostile work environment, as some of you have witnessed.

**Censorship:** In the Co-Editors' Introduction, there was a critical discussion linking the struggles for access to HIV/AIDS medication with broader global politics including a reference to Gaza and occupation. Dr. Berger unilaterally demanded that this be removed.

**Unauthorized Use of Work:** Dr. Berger attempted to use materials from this book to pitch exhibitions based entirely on the work produced to date by the Co-Editors— and did so without our knowledge or consent. From the outset, our work was meant to serve as a publication with an accompanying exhibition, not be repurposed unilaterally.

**Termination:** After I formally requested mediation and a review of Dr. Berger's conduct by the Leslie-Lohman Museum of Art (the project's co-sponsor and co-producer), Dr. Berger terminated my role as Co-Editor.

**Attempts to erase my role and undue influence:** Dr. Berger now claims he will proceed with publication without crediting any of my labor or authorship in a new or 'different' project. He has leveraged his position as a private art collector and as board member & chair of acquisitions of the museum to minimize my contributions and alter    the    editorial    vision    of    the    project.

All of the above risks reframing the book as something else entirely, especially should the museum withdraw its involvement as a result of Dr. Berger's inappropriate behavior. I remain committed to the activism and intellectual work that brought many of us into this project. I share this update so that you are aware of the situation and the    context    in    which    the    project    now    stands.

38.        In response to Paragraph 38 of the Complaint, Defendant denies the allegations. Defendant denies that Plaintiff has accurately characterized any information allegedly shared, denies that any alleged disclosures were improper, and denies that Plaintiff has identified with particularity any "confidential information" purportedly disclosed in violation of the Contract. Defendant further denies that any communications by Defendant were disseminated beyond persons and entities with a legitimate, need-to-know interest in the New Rebel Project.

Defendant further states that, to the extent any communications occurred, they were made in good faith and were reasonably necessary to (i) protect Defendant's authorship, professional credit, and contractual rights; (ii) address and oppose discriminatory and retaliatory conduct and a hostile work environment; and (iii) prevent, document, and remediate ongoing unlawful conduct affecting a multi-party collaborative publication involving additional indispensable parties, including the project's institutional sponsor and publisher. Defendant further states that Plaintiff cannot transform protected activity into a contractual breach by labeling it "confidential," and cannot use a confidentiality clause as a gag order to conceal misconduct or to retaliate against Defendant for protected complaints. Any alleged communications relating to Plaintiff's conduct, editorial interference, termination, or attempts to erase Defendant's role constituted protected whistleblower and anti-retaliation activity and are protected under New York Labor Law § 740, the NYCHRL, the NYSHRL, and analogous federal and state doctrines. Defendant denies the remaining allegations of Paragraph 38.

39.        In response to Paragraph 39 of the Complaint, Defendant denies the allegations. Defendant denies that Plaintiff suffered damages as alleged, denies that any alleged damages were

caused by Defendant, and denies that Plaintiff is entitled to recover any amount, including the conclusory and unsupported allegation that damages are "in no event" less than $100,000.

Defendant further states that any alleged delays, costs, or publication-related expenses were caused by Plaintiff's own acts and omissions, including Plaintiff's material breaches, discriminatory and retaliatory conduct, creation of a hostile work environment, unilateral editorial interference and censorship demands, attempts to erase Defendant's role and contributions, and the filing of this retaliatory lawsuit. Defendant further states that Plaintiff's claimed damages are speculative, self-inflicted, and not recoverable.

Defendant denies the remaining allegations of Paragraph 39.

40.        In response to Paragraph 40 of the Complaint, Defendant denies the allegations. Defendant admits only that the Original Contract contained an indemnification provision limited to liabilities arising from Defendant's work within the narrow scope of the original catalog project contemplated at the time of execution. Defendant denies that Plaintiff is entitled to indemnification in the manner alleged, and denies that any indemnification provision applies to the materially transformed New Rebel Project or to Defendant's later-created original works of authorship outside the scope of the Original Contract.

Defendant further states that the indemnification provision does not, and as a matter of law cannot, require Defendant to indemnify Plaintiff for Plaintiff's own breaches of contract, unlawful conduct, discriminatory acts, retaliatory conduct, or the creation of a hostile work environment, nor for liabilities arising from Plaintiff's misuse or misappropriation of Defendant's independent authorship. Any interpretation requiring indemnification for Plaintiff's own misconduct or statutory violations is contrary to public policy and unenforceable as applied.

**41.** In response to Paragraph 41 of the Complaint, Defendant denies the allegations and denies that Plaintiff is entitled to recover attorneys' fees or costs. Defendant further denies that any contractual provision authorizes the fee-shifting Plaintiff seeks, and denies that Plaintiff can recover fees or costs arising from Plaintiff's own breaches, misconduct, and retaliatory filing of this action.

Defendant further states that Plaintiff's claims are frivolous and brought for an improper purpose, including retaliation for Defendant's protected complaints, and that Defendant is entitled to recover his reasonable attorneys' fees and costs to the extent permitted by applicable law and any governing agreements. Defendant denies the remaining allegations of Paragraph 41.

## ANSWER TO PRAYER FOR RELIEF

In response to Plaintiff's Prayer for Relief, Defendant denies that Plaintiff is entitled to any of the relief requested. Defendant requests that the Complaint be dismissed with prejudice in its entirety, that judgment be entered in favor of Defendant, and that Defendant be awarded his costs, disbursements, and reasonable attorneys' fees to the fullest extent permitted by applicable law and any governing agreements, together with such other and further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

Defendant asserts the following affirmative defenses to Plaintiff's claims. In asserting these affirmative defenses, Defendant does not assume any burden of proof on issues as to which Plaintiff bears the burden. Defendant expressly reserves all rights to assert additional defenses, defenses in mitigation, and/or to amend these defenses as discovery proceeds and as additional facts become known.

## FIRST AFFIRMATIVE DEFENSE

## FAILURE TO JOIN REQUIRED PARTIES (FED. R. CIV. P. 19)

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to join required parties under Federal Rule of Civil Procedure 19. Plaintiff seeks sweeping declaratory relief and contractual remedies concerning copyright ownership, authorship, publication rights, editorial control, and alleged breaches arising from the New Rebel Project. Adjudication of these issues necessarily implicates the rights and interests of absent parties, including Phaidon Press, the publisher and contracting party for the New Rebel Project; the Leslie-Lohman Museum of Art, the institutional sponsor/producer associated with the project; and Camilo Godoy, a co-editor, contributor, and participant in the creation, development, and execution of the works and communications Plaintiff challenges. These absent parties have independent contractual, editorial, financial, and copyright-related interests that would be impaired or impeded by a judgment in their absence, and their absence prevents the Court from according complete relief among the existing parties. Proceeding without them would also expose Defendant to a substantial risk of inconsistent obligations and inconsistent adjudications concerning the same works, rights, and contractual relationships. Accordingly, Plaintiff's claims should be dismissed, or, at minimum, stayed unless and until all required parties are joined.

## SECOND AFFIRMATIVE DEFENSE

## FAILURE TO STATE A CLAIM (RULE 12(b)(6))

Plaintiff's Complaint fails to state a claim upon which relief can be granted. Plaintiff has not plausibly alleged facts establishing a valid work-made-for-hire relationship or a written transfer of copyright under 17 U.S.C. §§ 101 and 204, and has not plausibly alleged any breach by Defendant or damages proximately caused by Defendant. Accordingly, Plaintiff is not entitled to the declaratory or monetary relief sought.

## THIRD AFFIRMATIVE DEFENSE

## NO WORK MADE FOR HIRE (17 U.S.C. § 101)

Plaintiff's claims are barred, in whole or in part, because Defendant's original works of authorship in connection with the New Rebel Project do not constitute "works made for hire" under the Copyright Act, 17 U.S.C. § 101. The New Rebel Project materially and fundamentally departed from the limited, preliminary editorial services contemplated by the Original Contract and evolved into a substantially different, co-conceived scholarly publication. Defendant's substantial original authorship—including, inter alia, the Editors' Introduction, chapter frameworks, conceptual architecture, authored scripts and prompts for recorded conversations, and Defendant's own spoken and written contributions—was created outside any employment relationship and outside any valid work-for-hire arrangement. The Original Contract contains no express "work made for hire" designation and does not satisfy the statutory prerequisites for a commissioned work made for hire. Plaintiff did not commission, amend the agreement to cover, or fairly compensate Defendant for this additional original authorship. Accordingly, Defendant retains copyright

ownership in his original contributions, and Plaintiff is not entitled to declaratory relief or damages premised on a work-for-hire theory.

## FOURTH AFFIRMATIVE DEFENSE

### JOINT AUTHORSHIP / JOINT WORK (17 U.S.C. § 101)

Plaintiff's claims are barred, in whole or in part, because the New Rebel Project constitutes a joint work of authorship created by Defendant and others, including Plaintiff and Camilo Godoy. Under the Copyright Act, 17 U.S.C. § 101, a "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." The New Rebel Project was developed and produced as a collaborative scholarly publication with the intention that multiple contributors' and editors' contributions—including Defendant's original authorship—would be merged into a unitary whole. Accordingly, Defendant is a joint author with an undivided ownership interest in the copyright in the New Rebel Project and/or in independently copyrightable portions thereof. Plaintiff is therefore not entitled to any declaration of exclusive ownership, any relief extinguishing Defendant's rights, or any damages premised on the theory that Plaintiff owns the work to the exclusion of Defendant.

## FIFTH AFFIRMATIVE DEFENSE

### COPYRIGHT OWNERSHIP IN DEFENDANT'S ORIGINAL CONTRIBUTIONS

Plaintiff's claims are barred, in whole or in part, because Defendant owns copyright in specific contributions to the New Rebel Project that constitute original works of authorship created by Defendant and not transferred to Plaintiff. Defendant's copyrightable original contributions include, by way of example and not limitation: (1) the Editors' Introduction; (2) chapter

frameworks and thematic structures; (3) the conceptual architecture and organizational logic of the book; (4) authored scripts, interview prompts, questions, and structuring text used to develop recorded conversations and interviews; and (5) Defendant's own spoken and written contributions incorporated into the New Rebel Project. These works were created by Defendant as original expressions of Defendant's scholarship and voice. No valid work-made-for-hire agreement exists as to these works, and no written assignment satisfying 17 U.S.C. § 204 transferred Defendant's copyrights to Plaintiff. Accordingly, Plaintiff is not entitled to any declaratory judgment or damages that would extinguish, appropriate, or misattribute Defendant's copyright interests in these original contributions. Material Breach by Plaintiff Plaintiff's breaches were not minor or technical; they went to the heart of the contractual relationship by destroying the conditions under which Defendant could safely and lawfully perform his work. A party who creates a hostile, discriminatory, and retaliatory environment cannot invoke contract provisions to punish the victim of that conduct. Plaintiff materially breached the Original Contract by, among other things: (1) subjecting Defendant to disability-based discrimination and creating a hostile work environment; (2) retaliating against Defendant for opposing discrimination and making protected complaints; (3) attempting to censor and remove Defendant's contributions that referenced his HIV-positive status and HIV/AIDS; (4) attempting to remove Defendant's credit and authorship; (5) threatening Defendant's professional career; and (6) filing this retaliatory lawsuit. Plaintiff's material breaches occurred first in time and excuse Defendant's performance under the contract. A party who has materially breached a contract cannot enforce that contract against the other party. Plaintiff's breaches were not minor or technical; they went to the heart of the contractual relationship by destroying the conditions under which Defendant could safely and lawfully perform his work. A

party who creates a hostile, discriminatory, and retaliatory environment cannot invoke contract provisions to punish the victim of that conduct.

### SIXTH AFFIRMATIVE DEFENSE

### PRIOR MATERIAL BREACH / PERFORMANCE EXCUSED

Plaintiff's claims are barred, in whole or in part, because Plaintiff materially breached the parties' contractual and professional relationship first, thereby excusing any further performance by Defendant and barring Plaintiff from enforcing the Contract. Plaintiff's breaches were not minor or technical; they went to the heart of the relationship by destroying the conditions under which Defendant could safely and lawfully perform his work. Plaintiff materially breached the Contract and the parties' course of dealing by, inter alia: (1) subjecting Defendant to disability-based discrimination and creating a hostile work environment; (2) retaliating against Defendant for opposing discrimination and making protected complaints; (3) attempting to censor, suppress, or remove Defendant's contributions referencing Defendant's HIV-positive status and HIV/AIDS; (4) attempting to erase Defendant's credit and authorship; (5) threatening Defendant's professional career and standing; and (6) filing this action as retaliation for Defendant's protected activity.

Because Plaintiff's material breaches occurred first in time, Plaintiff is barred from enforcing the Contract against Defendant, and any obligations alleged against Defendant are excused. A party that manufactures a hostile, discriminatory, and retaliatory environment cannot invoke contractual provisions to punish the victim of that conduct, nor use contract claims as a vehicle for retaliation-by-lawsuit.

## SEVENTH AFFIRMATIVE DEFENSE

## UNCLEAN HANDS / INEQUITABLE CONDUCT BARS EQUITABLE RELIEF

Plaintiff's claims for equitable relief, including declaratory relief, are barred in whole or in part by the doctrine of unclean hands. Plaintiff has engaged in unlawful and inequitable conduct directly related to the subject matter of this action, including disability-based discrimination, retaliation for Defendant's protected complaints, attempts to censor and suppress Defendant's scholarship and HIV/AIDS-related contributions, threats to Defendant's professional career, and the filing of this lawsuit to intimidate and silence Defendant and to strip Defendant of authorship and credit. Plaintiff further used institutional leverage and influence in connection with the project— including influence arising from Plaintiff's role with and relationship to the Leslie-Lohman Museum of Art — to advance Plaintiff's personal interests and to retaliate against Defendant. Plaintiff's inequitable conduct bars the equitable relief he seeks, and Plaintiff is therefore not entitled to any declaratory judgment or other equitable remedy.

## EIGHTH AFFIRMATIVE DEFENSE

## ESTOPPEL

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel. Plaintiff represented to Phaidon Press and to others involved in the New Rebel Project that Defendant was a Co-Editor and a principal creative contributor to the project. Phaidon Press recognized Defendant as a Co-Editor and acknowledged Defendant's ownership interests in Defendant's contributions. Defendant reasonably relied on these representations and the parties' course of conduct by investing substantial time, effort, and original creative labor in co-developing, structuring, and co-authoring the New Rebel Project. Having induced Defendant's reliance and Defendant's

contributions, Plaintiff is estopped from reversing course and asserting exclusive ownership, authorship, or publication rights that would appropriate or extinguish Defendant's rights and credit. Accordingly, Plaintiff is not entitled to the declaratory or monetary relief sought.

## NINTH AFFIRMATIVE DEFENSE

## UNCONSCIONABILITY

Plaintiff's claims are barred, in whole or in part, because to the extent Plaintiff seeks to enforce the Original Contract's copyright/ownership provision against Defendant's later-created original authorship in the New Rebel Project, such enforcement would be unconscionable and contrary to equity and public policy. Plaintiff drafted and controlled the contractual language and now seeks to stretch narrow boilerplate—originally associated with limited editorial services for a preliminary catalog—into a sweeping forfeiture of Defendant's substantial scholarly authorship. Defendant was not acting as Plaintiff's attorney, is a non-practicing lawyer and not a copyright lawyer, and was paid only approximately $7,000—an objectively below-market fee—for what was represented as limited editorial curation services. Plaintiff then materially expanded the scope of work far beyond the original terms without amending the agreement or providing additional compensation, while seeking to leverage Defendant's scholarship and labor.

Plaintiff now attempts to appropriate Defendant's substantial original authorship—work Plaintiff neither commissioned nor compensated—based on a provision never intended to cover later-created co-authored scholarly content in a materially transformed project. Enforcing the provision as Plaintiff urges would be procedurally and substantively unconscionable and would operate as an inequitable forfeiture. Accordingly, Plaintiff is not entitled to the relief sought.

## TENTH AFFIRMATIVE DEFENSE

## FRAUD / FRAUDULENT INDUCEMENT / MISREPRESENTATION

Plaintiff's claims are barred, in whole or in part, by Plaintiff's fraud, fraudulent inducement, and misrepresentations.

Plaintiff induced Defendant to perform substantial additional work and to contribute original scholarly authorship to the New Rebel Project by representing that Defendant would be recognized as a Co-Editor and would receive appropriate credit and attribution for Defendant's contributions. Plaintiff made and repeated these representations to Defendant and to third parties involved in the project, including Phaidon Press, which recognized Defendant as a Co-Editor based on the work performed and the representations made.

Plaintiff failed to disclose, and concealed, Plaintiff's intent to later assert exclusive ownership over Defendant's original works of authorship, to appropriate Defendant's contributions without fair compensation, and/or to remove or minimize Defendant's credit and role. Plaintiff's misrepresentations and omissions were material, were relied upon by Defendant, and resulted in substantial reliance-based performance and creative labor by Defendant. Accordingly, Plaintiff's claims are barred by Plaintiff's own fraudulent conduct and inequitable misrepresentations.

## ELEVENTH AFFIRMATIVE DEFENSE

## WAIVER

Plaintiff's claims are barred, in whole or in part, by waiver. By words and conduct, Plaintiff knowingly and voluntarily relinquished any purported right to enforce the Original Contract's

copyright/ownership provision against Defendant's later-created original authorship in the New Rebel Project. Plaintiff represented to Phaidon Press and to others that Defendant was a Co-Editor and principal creative contributor; allowed the project to evolve into a materially different, co-authored scholarly publication without insisting on any work-made-for-hire arrangement, written assignment, or amended compensation; and accepted Defendant's substantial original authorship and co-development without contemporaneous objection.

Plaintiff did not assert the sweeping ownership claims alleged in this action until after Defendant engaged in protected activity, including complaints of discrimination and whistleblower disclosures. Plaintiff's belated assertion of exclusive ownership is inconsistent with Plaintiff's prior conduct and representations and is therefore waived. Accordingly, Plaintiff is not entitled to the declaratory or monetary relief sought.

## TWELFTH AFFIRMATIVE DEFENSE

### LACHES

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches. Plaintiff unreasonably and inexcusably delayed in asserting the exclusive copyright ownership and contract theories alleged in this action despite Plaintiff's knowledge that Defendant was contributing substantial original authorship to the New Rebel Project and despite Phaidon Press's recognition of Defendant as a Co-Editor and principal contributor. Plaintiff stood by while Defendant invested substantial time, effort, and original creative labor in developing, structuring, and authoring core aspects of the project in reliance on the parties' course of conduct and representations regarding Defendant's role and credit.

Plaintiff's delay has prejudiced Defendant by inducing reliance-based performance, foreclosing opportunities, and exposing Defendant to the costs and burdens of this litigation. Plaintiff asserted the ownership claims alleged here only after Defendant engaged in protected activity, including complaints of discrimination and whistleblower disclosures, further demonstrating that Plaintiff's claims are pretextual and retaliatory. Accordingly, Plaintiff is not entitled to the relief sought.

## THIRTEENTH AFFIRMATIVE DEFENSE

## COPYRIGHT MISUSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of copyright misuse.

Plaintiff is attempting to use copyright law—and the threat of copyright enforcement—not to protect legitimate copyright interests, but to suppress and control Defendant's scholarship and speech, including Defendant's HIV/AIDS-related contributions and perspective, which Plaintiff disparaged and sought to censor. Plaintiff further seeks to leverage copyright claims as a retaliatory weapon in response to Defendant's protected complaints of discrimination and whistleblower activity. Plaintiff's asserted ownership theories are being advanced as a mechanism to chill protected activity, to coerce surrender of authorship and credit, and to impose an unlawful restraint on speech and collaboration in a scholarly project. Such misuse of copyright law and process bars Plaintiff from obtaining declaratory or monetary relief predicated on Plaintiff's copyright theories.

## FOURTEENTH AFFIRMATIVE DEFENSE

## NO BREACH BASED ON PROTECTED REPORTING / PUBLIC POLICY

Plaintiff's claims are barred, in whole or in part, because Defendant cannot be held liable for breach of contract based on protected reporting and opposition activity. Any alleged communications by Defendant concerning discrimination, harassment, retaliation, copyright misappropriation, nonprofit-governance misconduct, or other unlawful conduct constituted protected activity, including lawful whistleblower disclosures, protected opposition to discrimination, and communications reasonably necessary to prevent, document, and remediate ongoing unlawful conduct. Plaintiff may not convert protected activity into a contractual "breach" through artful pleading, nor weaponize confidentiality or contract provisions as a gag order to suppress reports of unlawful conduct. To the extent Plaintiff's claims depend on treating protected complaints as a breach of contract, those claims are barred by public policy and applicable federal, state, and local anti-retaliation and whistleblower protections, including New York Labor Law § 740, the NYCHRL, and the NYSHRL.

## FIFTEENTH AFFIRMATIVE DEFENSE

## PROTECTED WHISTLEBLOWER ACTIVITY (N.Y. LAB. LAW § 740) / NO ENFORCEABLE "CONFIDENTIALITY" BREACH

Plaintiff's claims are barred, in whole or in part, because the conduct Plaintiff characterizes as "breaches of confidentiality" constituted protected whistleblower and anti-retaliation activity.

Defendant reasonably believed, based on the facts known to him, that Plaintiff was engaging in unlawful conduct, including misappropriation of Defendant's copyright interests and authorship and conduct implicating nonprofit governance, conflicts of interest, and misuse of institutional resources in connection with the Leslie-Lohman Museum of Art and the New Rebel Project. Defendant's disclosures and communications to institutional leadership and governance bodies

associated with the project, to Phaidon Press, and to contributors and collaborators were made in good faith, on a need-to-know basis, and for legitimate purposes, including to prevent, document, and remediate ongoing unlawful conduct and retaliation.

Plaintiff cannot enforce a confidentiality provision as a gag order to silence protected whistleblower activity or protected opposition to discrimination. Any alleged disclosure constituted protected activity, including lawful whistleblower disclosures and protected opposition to discrimination and retaliation, and is protected under New York Labor Law § 740, the NYCHRL, the NYSHRL, and analogous federal and state doctrines. Plaintiff may not transform protected activity into a contractual breach through artful pleading or retaliation-by-lawsuit.

## SIXTEENTH AFFIRMATIVE DEFENSE

## PROTECTED OPPOSITION TO DISCRIMINATION (NYCHRL / NYSHRL) / NO ENFORCEABLE "CONFIDENTIALITY" BREACH

Plaintiff's claims are barred, in whole or in part, because the conduct Plaintiff characterizes as "breaches of confidentiality" constituted protected opposition to disability-based discrimination and retaliation. Plaintiff subjected Defendant to disability-based harassment and a hostile work environment, including derogatory comments about Defendant's HIV status, disparaging Defendant's scholarship as an "AIDS obsession," calling Defendant a "sick person," and stating that Defendant had "a virus gone wrong in the head." Defendant's complaints and communications to institutional stakeholders associated with the project, including leadership of the Leslie-Lohman Museum of Art and other appropriate recipients, constituted protected opposition to unlawful discrimination and retaliation under the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq., and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq.

Plaintiff cannot enforce contractual provisions—including any purported confidentiality restriction—as a gag order to silence protected opposition to discrimination, nor may Plaintiff transform protected activity into a contractual "breach" through artful pleading or retaliation-by-lawsuit. To the extent Plaintiff's claims depend on recharacterizing protected complaints and opposition activity as a breach of contract, those claims are barred by public policy and by applicable whistleblower and anti-retaliation protections, including New York Labor Law § 740, the NYCHRL, the NYSHRL, and analogous federal and state doctrines.

### SEVENTEENTH AFFIRMATIVE DEFENSE

### RETALIATORY LAWSUIT / BAD FAITH / IMPROPER PURPOSE

Plaintiff's claims are barred, in whole or in part, because this action was filed in bad faith for an improper, retaliatory purpose—to intimidate, silence, and punish Defendant for engaging in protected activity, including complaints of discrimination, retaliation, and unlawful conduct. Upon information and belief, Plaintiff filed this lawsuit three days after Defendant's protected complaint to the Leslie-Lohman Museum of Art on October 28, 2025, and less than two months after Defendant's initial formal complaint to the same institution on September 6, 2025. Defendant further states that Plaintiff's termination letter removing Defendant from the project was sent on September 6, 2025, the same day as Defendant's formal complaint, evidencing retaliatory intent. Plaintiff's ownership and "breach" theories are pretextual and were asserted only after Defendant engaged in protected activity. Plaintiff may not use this Court and this litigation as a vehicle for retaliation-by-lawsuit or to manufacture leverage to erase Defendant's authorship, suppress Defendant's scholarship (including HIV/AIDS-related content), and coerce surrender of rights and credit. Plaintiff's retaliatory and bad-faith conduct bars Plaintiff from the declaratory and monetary

relief sought, and Defendant is entitled to seek all remedies available under applicable anti-retaliation and whistleblower laws and procedural doctrines, including recovery of fees and costs where permitted.

## EIGHTEENTH AFFIRMATIVE DEFENSE

## FAILURE TO MITIGATE DAMAGES

To the extent Plaintiff suffered any damages (which Defendant denies), Plaintiff's claims are barred or reduced, in whole or in part, by Plaintiff's failure to mitigate damages. Any alleged delays, costs, or publication-related complications were caused or exacerbated by Plaintiff's own acts and omissions, including Plaintiff's discriminatory and retaliatory conduct, creation of a hostile work environment, unilateral editorial interference and censorship demands, attempts to erase Defendant's authorship and credit, and the filing of this retaliatory lawsuit. Plaintiff failed to take reasonable steps to avoid or minimize any alleged damages and instead escalated and compounded them. Accordingly, any damages claimed by Plaintiff are not recoverable, or must be reduced, because Plaintiff failed to mitigate and because Plaintiff's own conduct was the proximate cause of any alleged loss.

## NINETEENTH AFFIRMATIVE DEFENSE

## RESERVATION OF ADDITIONAL DEFENSES

Defendant reserves the right to assert additional affirmative defenses, defenses in mitigation, and any other defenses that may become available as discovery proceeds and as additional facts and evidence become known.

## COUNTERCLAIMS

Counter-Plaintiff JORGE SÁNCHEZ, by his undersigned counsel, for his Counterclaims against Counter-Defendant DANIEL BERGER, alleges as follows:

### FACTUAL BACKGROUND FOR COUNTERCLAIMS

**Nature of the Action**

1.          This action arises from Counter-Defendant's unlawful course of conduct toward Counter-Plaintiff, including disability-based discrimination and harassment, retaliation, violations of copyright law, and retaliation-by-lawsuit. Counter-Defendant subjected Counter-Plaintiff—an openly queer Puerto Rican scholar living with HIV—to a hostile and discriminatory work environment by repeatedly disparaging Counter-Plaintiff and his scholarship with anti-HIV animus, including telling him he had an "AIDS obsession," calling him a "sick person," and stating he had "a virus gone wrong in the head." Counter-Defendant further attempted to censor and suppress Counter-Plaintiff's scholarship and contributions addressing HIV/AIDS (including targeted efforts to remove passages identifying Counter-Plaintiff as HIV-positive and discussions of HIV/AIDS medication access and global politics), threatened to damage Counter-Plaintiff's professional future, and sought to erase Counter-Plaintiff's authorship and credit while continuing to exploit and appropriate Counter-Plaintiff's work. After Counter-Plaintiff made protected complaints of discrimination and unlawful conduct to institutional stakeholders associated with the project, Counter-Defendant escalated retaliation, including purporting to terminate Counter-Plaintiff's role and, within days of Counter-Plaintiff's protected reporting, filing this action to intimidate, silence, and coerce Counter-Plaintiff into surrendering authorship, credit, and rights.

**Parties**

2.        Counter-Plaintiff Jorge Sánchez is an individual who resides in and is a citizen of the State of New Jersey. Counter-Plaintiff is an openly Queer Puerto Rican scholar living with HIV.

3.        Counter-Defendant Daniel Berger is an individual who resides in Chicago, Illinois, and is a citizen of the State of Illinois. Upon information and belief, Counter-Defendant is an AIDS specialist physician and researcher, and a trustee of the Leslie-Lohman Museum of Art ("LLMA"), including serving as Chair of the Museum's Collections Committee.

**Background**

4.        In or around October 2022, Counter-Plaintiff was invited by Counter-Defendant and Michael Sodomick (an LLMA Board member, "Trustee Sodomick") to curate *Rumblings of the Earth*, an exhibition at Iceberg Projects in Chicago, Illinois, an art space privately owned and operated by Counter-Defendant.

5.        Counter-Plaintiff met Counter-Defendant through Trustee Sodomick and Jonathan David Katz. At that time Counter-Defendant was looking for scholars rooted in queer of color critique to give the project he was working on intellectual legitimacy. During these early conversations, Counter-Plaintiff discussed his family history and his scholarly interest in HIV/AIDS with Counter-Defendant, including that he was HIV-positive.

6.        The *Rumblings of the Earth* exhibition, which explored Queer surrealism, led to further discussions of collaboration between Counter-Defendant and Counter-Plaintiff.

7.         Following the success of the *Rumblings of the Earth* exhibition, in early 2023, Counter-Defendant (an AIDS specialist physician) invited Counter-Plaintiff (a Queer Puerto Rican scholar living with HIV) and Camilo Godoy to provide editorial services on a catalog of works from Counter-Defendant's private art collection, the "Original Rebel." On or about October 23, 2023, Counter-Defendant, Counter-Plaintiff, and Godoy executed a basic Editorial Services Contract (the "Original Contract") describing an extremely narrow scope of editorial and curation services in connection with a catalog of works from Counter-Defendant's Collection and selection of contributors for the essays, reflections, and interviews.

8.         Counter-Plaintiff, a non-practicing lawyer who is also not a copyright lawyer, received a below-market editorial fee of approximately $7,000 for what was supposed to be only editorial curation services. However, the services ended up going way beyond the scope of the original terms. Counter-Plaintiff was paid for editing but ended up performing "writing and authorship" without just compensation. The scope of the work was materially altered without amending the compensation or the scope of the contract. This became a new project, the "New Rebel Project."

9.         Subsequently, in late 2023 and into 2024, the project transformed significantly into the New Rebel Project, with Counter-Plaintiff co-conceiving the title for the project, developing the curatorial framing, developing the thematic structure of what became the book (including the substantive four-chapter conversations that were recorded), developing the book's conceptual framework, creating the editorial structure, and writing portions of the book—which involved independently selected, arranged, and framed materials, and authoring the Editors' Introduction.

10.    Counter-Plaintiff also organized, participated in, and spoke in a series of recorded conversations that were later transcribed, edited, and excerpted for publication. These four-chapter conversations are a substantive portion of the New Rebel Project. Counter-Plaintiff selected the contributors, planned the conversations which included writing the interview prompts and conversation scripts. Counter-Plaintiff also had spoken contributions from these recordings which are quoted, edited, and contextualized within the book.

11.    Counter-Defendant sought to leverage Counter-Plaintiff's scholarly credentials and activist commitment to legitimize his collection, including Counter-Plaintiff's perspective and voice as someone living with HIV who is Puerto Rican and Queer.

12.    The project ultimately evolved into a new project, the New Rebel Project called *Rebel: Queer, Black, and Activist Art* ("Rebel"), a scholarly publication (a book) that Phaidon Press ("Phaidon") ultimately acquired and which would be co-sponsored and co-produced by LLMA and Phaidon Press.

13.    When the New Rebel Project was pitched to Phaidon Press on or about June 13, 2024, Counter-Plaintiff and Godoy primarily pitched the project. Counter-Defendant was largely silent during the pitch. Counter-Plaintiff presented the slides and the conceptual framing developed with Godoy. Keith Fox, then CEO of Phaidon, responded positively to the pitch and to Counter-Plaintiff's creative suggestion that he did not want to create "another coffee table book as is usually the case with books."

14.    Soon thereafter, on or about June 25, 2024, Phaidon agreed to partner on the New Rebel Project. Upon information and belief, LLMA's involvement as the institutional backer was critical in Phaidon's agreement to partner. LLMA played a significant role and drove the book's

publication from inception through funds contributed by Counter-Defendant to LLMA, and in turn, to Phaidon.

15.        When Rebel (New Rebel Project) was formally acquired by Phaidon for publication in or around summer 2024, Phaidon explicitly listed Counter-Plaintiff as a Co-Editor of Rebel (New Rebel Project).

16.        Counter-Plaintiff drafted the Editors' Introduction for Rebel (New Rebel Project), created the chapter frameworks, shaped the project's overall conceptual architecture, and organized and participated in several artists' conversations.

17.        With regard to artists' conversations, Counter-Plaintiff organized, participated in, and spoke in a series of recorded conversations with artists and scholars that were later transcribed, edited, and excerpted for publication.

18.        In at least one recorded conversation in which Counter-Defendant participated, Counter-Defendant delivered statements drawn from Counter-Plaintiff's authored text.

19.        All of these aforementioned contributions were new and original scholarly co-authorship contributions not covered by the narrow Editorial Services Contract. Therefore, Counter-Plaintiff, a Puerto Rican Queer scholar openly living with HIV, not only co-edited Rebel (New Rebel Project) but he also co-developed and co-authored it.

20.        In short, Rebel is an LLMA publication that brought together artists and scholars to examine the histories of queer, Black, and activist art. It features a wide range of 20th-21st century artists, and highlights the creative strategies shaped by cultural resistance and community

formation. The project also included the opportunity to conceive and curate a related exhibition at LLMA based on Counter-Defendant's art collection.

**Counter-Plaintiff Is Onboarded to Work for LLMA on the New Rebel Project**

21.        In or around May 2024, around the time that Phaidon became involved, Counter-Plaintiff was onboarded as a worker for LLMA, through which project invoices (including Counter-Plaintiff's payments for work on the New Rebel Project) would be regularly processed.

22.        Counter-Defendant informed Counter-Plaintiff that this structure was intentionally designed to provide Counter-Defendant with a favorable tax arrangement by routing funds between his private art collection and the non-profit museum (LLMA), and stated that the purpose of this arrangement was to avoid paying taxes. If accurate, such conduct would constitute a breach of nonprofit-governance obligations and a potential violation of federal and state tax laws.

23.        Part of Counter-Plaintiff's duties working for LLMA and Counter-Defendant included: (a) drafting invoices on behalf of LLMA for all eighteen collaborators on Rebel; (b) organizing collaborators' W-9 forms; (c) serving as liaison between LLMA's finance department and all contributors—for example contacting Sarah Bewell and Maggie Vail in LLMA's finance department for the processing of invoices by the project's authors as he was the point person requesting payment on behalf of their contributories; (d) participating in and following up on meetings with LLMA's Executive Director Alyssa Nitchun ("Executive Director Nitchun") and Head Curator / Director of Exhibitions and Collections Stamatina Gregory ("Head Curator Gregory") regarding their contributions; (e) assisting with onboarding collaborators; (f) participating in meetings concerning the feasibility of a related exhibition based on Rebel at the

museum; (g) performing other administrative work; and (h) coordinating work for LLMA regarding the publication of Rebel.

24.    Counter-Plaintiff also participated in multiple in-person meetings with LLMA's Executive Director Nitchun and Head Curator Gregory as part of developing their contributions to the book.

25.    LLMA is a non-profit and "the only dedicated LGBTQIA+ art museum in the world with a mission to exhibit and preserve LGBTQIA+ art and foster the artists who create it." As LLMA and Counter-Defendant (an LLMA Board Member) know, LLMA's claimed mission on its website is: "[LLMA] provides a platform for artistic exploration through multi-faceted queer perspectives. We embrace the power of the arts to inspire, explore, and foster understanding of the rich diversity of LGBTQIA+ experiences." LLMA's supposed "vision" is: "To be a home for queer art, artists, scholars, activists and allies, and a catalyst for discourse on art and queerness."

26.    Significantly, according to LLMA, "[d]uring the height of the AIDS pandemic," LLMA's founders grew their collection of art from gay artists as "they rescued the work of dying artists from families who, out of shame or ignorance, wanted to destroy it." LLMA further states: "This led to the formation of the Leslie-Lohman Gay Art Foundation in 1987. In recognition of its importance in the collection and preservation of LGBTQIA+ history, the organization was accredited as a museum in 2016. Through exhibitions, public programs, publications, and its collections and library, the Museum examines the interrelationship of art and social justice in ways that provoke thought and dialogue."

27.    However, as Counter-Plaintiff would soon learn, irrespective of LLMA's mission and history of activism on HIV/AIDS, as Counter-Defendant's (an LLMA Board member) anti-

HIV discriminatory and/or retaliatory conduct towards Counter-Plaintiff escalated, LLMA failed to take remedial action to stop the unlawful conduct against Counter-Plaintiff (a Queer scholar living with HIV).

**Counter-Defendant Subjects Counter-Plaintiff to HIV-Based Discriminatory Harassment and a Hostile Work Environment**

28.     During the co-authorship and development process of the New Rebel Project, over the course of approximately one year (from approximately mid-late 2024 through late 2025), Counter-Defendant repeatedly made derogatory and discriminatory remarks about Counter-Plaintiff, referring to him and his research as an "AIDS obsession," calling Counter-Plaintiff a "sick person," and asserting that Counter-Plaintiff had "a virus gone wrong in the head." Counter-Plaintiff is openly living with HIV, which Counter-Defendant knew.

29.     These discriminatory and derogatory comments were made by Counter-Defendant to Counter-Plaintiff in-person, on the telephone, and on Zoom.

30.     In response, Counter-Plaintiff repeatedly objected by stating that his work was not an "AIDS obsession" and that Counter-Defendant's comments were inappropriate. This was protected opposition to Counter-Defendant's HIV-based discriminatory comments.

31.     Because of Counter-Defendant's financial control over the New Rebel Project (including Rebel), Counter-Plaintiff was scared to push back too often initially because it escalated Counter-Defendant's hostility, which is evidenced by the retaliation Counter-Defendant subjected Counter-Plaintiff to when Counter-Plaintiff began to make more formal protected complaints as discussed below.

32.        Counter-Defendant made remarks about Counter-Plaintiff having an "AIDS obsession" in the presence of Godoy, and LLM trustee Michael Sodomick.

33.        The editorial meetings between Counter-Defendant, Counter-Plaintiff, and Godoy often became contentious. While both Counter-Defendant and Counter-Plaintiff would call Trustee Sodomick to vent about the contentiousness of the meetings because Trustee Sodomick was one of the original initiators of the collaboration, Counter-Defendant also told Trustee Sodomick, in sum and substance, that Counter-Plaintiff would "never find a job at the museum or in the art world."

34.        This open threat against Counter-Plaintiff made to LLMA's trustee also demonstrated Counter-Defendant's willingness to use his institutional power and influence to retaliate and/or discriminate against Counter-Plaintiff.

35.        Moreover, upon information and belief, Counter-Defendant was making comments about Counter-Plaintiff to others as well, including people on the New Rebel Project.

36.        For example, on or about May 22, 2025, Trustee Sodomick, Counter-Defendant, Dr. Jonathan David Katz (a fellow academic, contributor on Rebel (New Rebel Project), and Counter-Plaintiff's peer in the art world), and others were out for dinner in Chicago after pride weekend. Apparently, the conversation became uncomfortable because Counter-Defendant began making disparaging remarks about Counter-Plaintiff causing Trustee Sodomick to shut down the conversation.

37.        Subsequent to this, Trustee Sodomick decided to intervene by suggesting a mediation between Counter-Defendant and Counter-Plaintiff.

38.         Counter-Defendant's continuous, and ongoing discriminatory and/or retaliatory statements to Counter-Plaintiff and his comments about Counter-Plaintiff to others (e.g., Trustee Sodomick) created a hostile and discriminatory working environment for Counter-Plaintiff at LLMA in connection with The New Rebel Project, Rebel, and the related exhibition.

### Counter-Plaintiff Makes Protected Complaints to Trustee Sodomick

39.         Counter-Plaintiff had several discussions with Trustee Sodomick where he discussed and reported Counter-Defendant's conduct because he wanted the bullying to stop.

### Counter-Defendant's Discrimination and/or Retaliation Continues

40.         In furtherance of the discrimination and/or retaliation, on or about July 30, 2025, Counter-Defendant undertook efforts to remove Counter-Plaintiff's contributions that directly referenced HIV/AIDS.

41.         For example, Counter-Defendant demanded that Counter-Plaintiff remove a section of the Editors' Introduction discussing access to HIV/AIDS medications and global politics. Counter-Defendant also demanded that Counter-Plaintiff remove his contribution from one of the conversations that Counter-Plaintiff organized and authored.

42.         The passage Counter-Defendant sought to eliminate from Rebel specifically discussed Counter-Plaintiff's HIV positive status, which edited version read:

> As someone who is HIV positive, the question of how knowledge is transferred—
> both horizontally and vertically, in a Hortense Spillers kind of way—is deeply
> meaningful to me, especially when thinking about the grid and the meme as forms
> of transmission and structure. So, reflecting on what you've shared about the project

of Black liberation—and on what older generations of long-term survivors of our AIDS holocaust can offer younger generations, especially Black and Queer youth—feels particularly urgent and moving.

43.     Counter-Defendant's targeted attempt to remove this passage where Counter-Plaintiff identified himself as someone living with HIV reflected the same discriminatory animus conveyed in Counter-Defendant's prior discriminatory remarks (i.e., "AIDS obsession", "sick person", "a virus gone wrong in the head.").

44.     By July 30, 2025, Rebel (the New Rebel Project) was substantially complete—all contributions submitted, conversations transcribed, and the manuscript was only entering final editing, so attempts to remove Counter-Plaintiff at this stage were discriminatory and/or retaliatory.

45.     Even after Counter-Plaintiff objected, Counter-Defendant via Godoy, emailed Phaidon's senior editor with edits that Counter-Plaintiff did not authorize.

46.     Counter-Plaintiff immediately responded to the senior editor copying Counter-Defendant and Godoy in an email, which read: "Just a quick follow-up. Please disregard the edit made by Camilo on page 173 related to the joint conversation between Naomi, Rashid, and me. As a direct participant in that conversation and the one who recorded it-I retain rights over my contributions. No one is authorized to alter or remove my input or credit without my prior consent, which I have not granted." This was a protected whistleblower complaint.

47.     At one point in communications with Phaidon, on or about August 14, 2025, Phaidon's senior editor stated to Counter-Plaintiff in an email in part: "You, Naomi, and Rashid

'own copyright in your respective transcribed contributions.'" Phaidon also agreed to include Counter-Plaintiff's name in order to provide credit for the conversations.

**Trustee of LLMA Offers to Mediate but the Hostile Work Environment Continues**

48.      Trustee Sodomick offered to mediate the situation in order for the bullying against Counter-Plaintiff to stop. Upon information and belief, Trustee Sodomick informed Executive Director Nitchun and/or LLMA Board President Diane Felicio ("Board President Felicio") about Counter-Defendant's conduct towards Counter-Plaintiff, prior to the mediation taking place.

49.      On or about September 4, 2025, the mediation occurred. At the beginning of the mediation, it was conveyed that there was a need for Counter-Defendant's bullying towards Counter-Plaintiff to stop as the purpose for the mediation.

50.      Counter-Defendant became increasingly hostile during the mediation stating, in sum and substance, "I am the boss," and explicitly threatening to remove Counter-Plaintiff from the book if Counter-Plaintiff did not yield to removing his contributions that directly referenced HIV/AIDS because he felt Counter-Plaintiff was making the book about HIV/AIDS.

51.      Counter-Defendant also threatened Counter-Plaintiff by stating that he was a "young editor and young writer," and implied that he would damage his career if he disagreed with him.

52.      Despite Trustee Sodomick's mediation efforts, the hostile work environment continued, and Counter-Defendant's threats escalated, which necessitated that Counter-Plaintiff file a formal complaint with LLMA's museum leadership two days later, on September 6, 2025.

**Counter-Plaintiff Makes a Protected Complaint**

53.　　　　On September 6, 2025 (in the early morning), Counter-Plaintiff wrote to LLMA Executive Director Nitchun, as LLMA employed and paid Counter-Plaintiff on the project. In his email, he not only raised concerns about proper crediting of scholarly contributions but also raised concerns about HIV discrimination.

54.　　　　Counter-Plaintiff's September 6, 2025 letter stated in relevant part:

> Recent developments in the editorial process have raised serious concerns regarding the accurate crediting of my scholarly contributions. Dr. Berger has threatened to remove me from the book entirely, relying on legally dubious arguments. As an independent contractor for Dr. Berger, I provided editorial services. In addition to and beyond my contractual obligations, I co-created and co-developed materials that are now fundamental to the book. While my role as co-editor is explicitly acknowledged in the MOU, there have been efforts to diminish or erase my credit in ways that do not align with the factual or contractual record. More troublingly, Dr. Berger has sought to leverage his position as a private art collector—including his financial influence and institutional standing—by reaching out to certain participants in the conversations I organized in an effort to minimize or invisibilize my contributions.
>
> As you know, this project was presented from the outset as a scholarly collaboration, grounded in the participation of invited artists, writers, and curators. It is my belief that misrepresentation of authorship undermines that mission and risks reframing the project as something else entirely: a scheme of market speculation in which a collector, who serves as Chair of the Museum's Collections Committee and is also a museum board member, produces a book not to advance scholarship but to raise the market value of his personal collection. I know the Museum rejects this appearance of impropriety.
>
> I also want to note that as someone openly living and thriving with HIV, and as a scholar who has spent years expanding the field of art historical scholarship in this area, I entered this collaboration in the spirit of the Museum's mission: to elevate cuir/queer, BIPOC, and dissident voices and to foreground histories too often marginalized. That commitment has guided my involvement from the very

beginning, and I trust the Museum continues to hold that mission as central to this project. **I must also share that, on several occasions, I have been told inappropriately that I have an "obsession" with HIV/AIDS—remarks** that diminish the legitimacy and importance of my scholarship in this area. My goal in writing to you is to ensure that my efforts and contributions are respected and not erased.

55.    This constituted protected activity under applicable anti-discrimination laws and New York's whistleblower law concerning not-for-profit law violations and copyright violations.

56.    Trustee Sodomick forwarded this email to LLMA Head Curator Gregory and LLMA Board President Felicio. The entire LLMA Board was made aware of Counter-Plaintiff's protected complaint after he sent it.

57.    Trustee Sodomick also made Board President Felicio aware of Counter-Plaintiff's protected complaint that same day, September 6, 2025, by phone call.

58.    Because he witnessed the discriminatory conduct and attempted to mediate, Trustee Sodomick also informed Board President Felicio of Counter-Defendant's discriminatory conduct after Counter-Plaintiff sent his protected complaint, if not before.

## Counter-Defendant Continues to Retaliate

59.    On that very same day, a few hours after Counter-Plaintiff's September 6, 2025 protected complaint to Executive Director Nitchun, Counter-Defendant retaliated by sending Counter-Plaintiff a letter informing him of his intent to terminate their contract in thirty days for pretextual alleged breaches.

60.    The retaliatory letter, among other things, purported to unilaterally terminate Counter-Plaintiff's role as Co-Editor, attempted to erase Counter-Plaintiff's credit and authorship,

threatened to proceed with publication of Rebel (the New Rebel Project) using Counter-Plaintiff's co-authored contributions without Counter-Plaintiff's consent.

61.      Counter-Defendant also unequivocally used his power to explicitly threaten Counter-Plaintiff's career by stating in the letter: "At this point any rational person would agree it is appropriate to find a way to move forward in a professional manner in the small and intersecting art world we co-exist within. As you prepare for a career in the art world, it may be best for all parties to agree to a Non-Disclosure Agreement (NDA)...."

62.      Counter-Defendant also retaliated in the letter by blaming Counter-Plaintiff (the victim of discrimination) for creating a hostile work environment, when it was Counter-Defendant who was creating such an environment by his anti-HIV discriminatory comments and actions against Counter-Plaintiff.

63.      In his letter to Counter-Plaintiff, Counter-Defendant admits that he received Counter-Plaintiff's protected complaint that morning because he explicitly references it: "Your email sent on September 6, 2025 at 6:56 AM to Alyssa Nitchun, Museum Director of the Leslie Lohman Museum of Art and Board Member Michael Sodomick...." This admission unequivocally demonstrates that Counter-Defendant's subsequent letter to Counter-Plaintiff to terminate their contract was retaliatory in nature.

64.      That same day, Counter-Plaintiff forwarded the termination notice to the LLMA Executive Director Nitchun, Head Curator Gregory, Godoy and Counter-Defendant, and made another protected complaint.

65.        On September 7, 2025, Counter-Plaintiff sent Counter-Defendant a Cease and Desist Demand, which Counter-Plaintiff forwarded to Executive Director Nitchun on September 8, 2025, copying Counter-Defendant, Trustee Sodomick, Godoy, and Head Curator Gregory.

66.        On October 1, 2025, in response to a communication from Counter-Defendant's attorney, Counter-Plaintiff made another protected complaint of unlawful harassment and disability-based discrimination under the NYCHRL as well as copyright law violations.

67.        On or about October 17, 2025, in furtherance of the retaliation, Counter-Defendant's attorney informed Counter-Plaintiff that he had been terminated based on the contract. The letter also essentially threatened a retaliatory lawsuit if Counter-Plaintiff pursued any claims against Counter-Defendant, LLMA, or Phaidon.

**Counter-Plaintiff Asks LLMA for Its Harassment, Discrimination, and Conflicts of Interest Policies and Makes Additional Protected Complaints**

68.        Among other things, throughout this period, from approximately mid-September 2025 onward, LLMA failed to abide by its responsibilities and obligations under anti-discrimination laws by failing to engage in an independent assessment and/or investigation into Counter-Plaintiff's protected complaints and by attempting to distance itself from Counter-Plaintiff—aiding and abetting the discrimination and retaliation of Counter-Defendant.

69.        In response to LLMA attempting to distance and extricate itself from the situation, on or about September 29, 2025, Counter-Plaintiff made another protected complaint to Executive Director Nitchun. This was an additional protected complaint of discrimination and retaliation, and an additional whistleblower complaint.

70.    In addition, through this period, Counter-Plaintiff repeatedly asked Executive Director Nitchun to share LLMA's current Conflicts of Interest policy and its policies about harassment and discrimination.

71.    For example, on October 6, 2025, Counter-Plaintiff emailed Executive Director Nitchun in part: "Could you please share with me the Museum's current Conflict of Interest policy as well as its policies regarding harassment and discrimination? Given the comments Dr. Berger made to me during this project and how things have transpired, I want to understand the Museum's stated procedures and protections." This was an additional protected complaint of discrimination and retaliation, and an additional whistleblower complaint.

72.    On October 20, 2025, Counter-Plaintiff followed up with Executive Director Nitchun and requested the "policies" again. Executive Director Nitchun and LLMA did not provide Counter-Plaintiff with those policies, claiming that the policy documents were "internal or protected materials."

73.    On October 22, 2025, nine days before Counter-Defendant filed his retaliatory lawsuit against Counter-Plaintiff, Counter-Plaintiff wrote to LLMA's Executive Director Nitchun and made another protected complaint. This was an additional protected complaint of discrimination and retaliation, and an additional whistleblower complaint.

74.    LLMA and the LLMA Board also refused to communicate the outcome of any review and/or investigation (i.e., LLMA decisions, LLMA Board decisions) into Counter-Plaintiff's protected complaints about Counter-Defendant's conduct, including his discriminatory and/or retaliatory conduct.

75.        Following his protected complaints, LLMA also decided to place another catalog promised for production relating to an exhibition Counter-Plaintiff curated at the museum, *ficciones patógenas*, on hold. As a result, Counter-Plaintiff has not been able to produce and publish the book associated with the exhibition.

### Counter-Plaintiff Makes Another Protected Complaint

76.        On October 28, 2025, Counter-Plaintiff made another discrimination, retaliation, and whistleblower complaint in an email that included Executive Director Nitchun and Head Curator Gregory of LLMA. The email read as follows:

> "Dear collaborators,
> I am writing as the Co-Editor of Rebel: Queer, Black, and Activist Art to share an important update about the status of a project many of us have contributed to and care deeply about. This project was presented from the outset as a committed scholarly collaboration, grounded in the participation of invited activists, artists, writers, and curators. Unfortunately, a series of deeply troubling developments have since taken place that now jeopardize the future of the publication:
>
> **Hostile Conduct:** I was repeatedly told by Dr. Berger that my research — and I personally — had an "AIDS obsession" and that I was a "sick person" with "a virus gone wrong in the head." Such comments, as someone openly living with HIV, demean the legitimacy of my scholarship and have created a hostile work environment, as some of you have witnessed.
>
> **Censorship:** In the Co-Editors' Introduction, there was a critical discussion linking the struggles for access to HIV/AIDS medication with broader global politics including a reference to Gaza and occupation. Dr. Berger unilaterally demanded that this be removed.
>
> **Unauthorized Use of Work:** Dr. Berger attempted to use materials from this book to pitch exhibitions based entirely on the work produced to date by the Co-Editors— and did so without our knowledge or consent. From the outset, our work was meant to serve as a publication with an accompanying exhibition, not be repurposed unilaterally.

**Termination:** After I formally requested mediation and a review of Dr. Berger's conduct by the Leslie-Lohman Museum of Art (the project's co-sponsor and co-producer), Dr. Berger terminated my role as Co-Editor.

**Attempts to erase my role and undue influence:** Dr. Berger now claims he will proceed with publication without crediting any of my labor or authorship in a new or 'different' project. He has leveraged his position as a private art collector and as board member & chair of acquisitions of the museum to minimize my contributions and alter the editorial vision of the project.

All of the above risks reframing the book as something else entirely, especially should the museum withdraw its involvement as a result of Dr. Berger's inappropriate behavior. I remain committed to the activism and intellectual work that brought many of us into this project. I share this update so that you are aware of the situation and the context in which the project now stands.

**Counter-Defendant Retaliates Against Counter-Plaintiff by Filing a Lawsuit Against Him**

77.      On October 31, 2025, in retaliation for his protected complaints, Counter-Defendant commenced a lawsuit against Counter-Plaintiff in federal court in Illinois seeking declaratory judgment regarding ownership of the New Rebel Project, Rebel, and damages for alleged breach of contract.

78.      This lawsuit was filed only three days after Counter-Plaintiff's protected complaint to LLMA on October 28, 2025, and less than two months after Counter-Plaintiff's initial formal complaint to LLMA on September 6, 2025.

**LLMA Sought to Financially Benefit from Counter-Defendant's Donations to LLMA**

79.    Upon information and belief, in connection with the New Rebel Project, Counter-Defendant made donations exceeding $180,000 to LLMA to fund the book (Rebel) and related exhibition.

80.    As set forth above, through its actions and inactions, LLMA discriminated and/or retaliated against Counter-Plaintiff, including by its failure to meaningfully address his reports of discrimination and retaliation in order to curry favor with its major donor and board member, Counter-Defendant, who relentlessly subjected Counter-Plaintiff to a hostile, discriminatory, and retaliatory work environment.

**Counter-Plaintiff Has Suffered Significant Emotional Distress Damages**

81.    From October 2024 through fall 2025, Counter-Plaintiff was subjected to HIV-based discriminatory remarks, escalating hostility, retaliation for protected activity, and the weaponization of litigation—conduct that progressively eroded his emotional stability and physical well-being.

82.    The discriminatory messaging became increasingly humiliating and destabilizing, including Counter-Defendant's comments that Counter-Plaintiff was "obsessed" with HIV/AIDS and that the virus was "in [his] head," making him sick and unable to perform his work—remarks Counter-Defendant communicated to others in the art world/professional community.

83.    Over time, the cumulative impact manifested as chronic anxiety, persistent insomnia, intrusive thoughts, and hypervigilance, accompanied by appetite loss and unintended weight loss.

84.      By summer and early fall 2025, these symptoms materially impaired Counter-Plaintiff's ability to function at his normal academic and cognitive capacity, requiring a formal request for academic extensions and prompting his treating psychologist to raise the possibility of a leave/sabbatical.

85.      On or about October 21, 2025, the escalating discrimination and reputational threat precipitated an acute mental-health crisis with suicidal ideation, and Counter-Plaintiff contacted the CARES/CPS crisis hotline because he did not feel safe and required immediate intervention.

86.      The retaliatory federal lawsuit then intensified the fear and disruption: it generated confusion and alarm within the campus community, including rumors that ICE agents were looking for him, causing Counter-Plaintiff to feel unsafe, and experience heightened hypervigilance.

87.      Counter-Plaintiff is currently in ongoing treatment with Dr. Jessica McLaughlin (clinical psychologist) and Lissa Edmond (licensed therapist) and was prescribed sleep medication due to stress-related insomnia; despite treatment, his symptoms remain severe and persistent.

88.      In parallel, the retaliation has compounded the harm to Counter-Plaintiff's professional trajectory, including the museum's decision to place a promised exhibition catalog on hold—an outcome that undermines his scholarly visibility and career advancement and magnifies the emotional distress tied to reputation, livelihood, and professional standing.

89.      Counter-Defendant's conduct has therefore had a severe impact on Counter-Plaintiff's mental health.

## COUNT I

## COPYRIGHT INFRINGEMENT AND DECLARATORY JUDGMENT

90.     Counter-Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 89 above as though fully set forth herein.

91.     Counter-Plaintiff is the author and owner of copyright in original works of authorship that he created in connection with the New Rebel Project, including but not limited to: (1) the Editors' Introduction; (2) chapter frameworks and thematic structures; (3) the conceptual architecture of the book; (4) conversation scripts and interview prompts; and (5) Counter-Plaintiff's spoken contributions to recorded conversations.

92.     These works constitute original works of authorship fixed in tangible media and are protected by copyright under the Copyright Act, 17 U.S.C. § 101 et seq.

93.     Counter-Defendant has threatened to use Counter-Plaintiff's copyrighted works without authorization, including by threatening to publish Rebel with Counter-Plaintiff's contributions but without Counter-Plaintiff's consent or proper credit.

94.     Counter-Defendant's threatened conduct constitutes threatened copyright infringement under 17 U.S.C. § 501.

95.     An actual controversy exists between Counter-Plaintiff and Counter-Defendant as to the ownership of copyrights in Counter-Plaintiff's original works of authorship.

96.     Counter-Plaintiff seeks a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that: (1) Counter-Plaintiff is the author and owner of copyright in his original works of authorship; (2) Counter-Defendant has no copyright interest in Counter-Plaintiff's original works; and (3)

Counter-Defendant's use of Counter-Plaintiff's works without authorization would constitute copyright infringement.

97.	Counter-Plaintiff is entitled to injunctive relief prohibiting Counter-Defendant from using Counter-Plaintiff's copyrighted works without authorization.

## COUNT II

## BREACH OF CONTRACT

98.	Counter-Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 97 above as though fully set forth herein.

99.	Counter-Plaintiff and Counter-Defendant entered into the Original Contract in October 2023.

100.	Counter-Plaintiff performed his obligations under the Original Contract and provided substantial additional services and original authorship beyond the scope of the contract.

101.	Counter-Defendant breached the Original Contract by: (1) subjecting Counter-Plaintiff to disability-based discrimination and creating a hostile work environment; (2) retaliating against Counter-Plaintiff for opposing discrimination; (3) failing to provide a work environment free from discrimination; (4) pretextually terminating Counter-Plaintiff; and (5) attempting to remove Counter-Plaintiff's credit and use his work without authorization.

102.	Counter-Defendant also breached the implied covenant of good faith and fair dealing by engaging in the conduct alleged herein.

103.     As a direct and proximate result of Counter-Defendant's breaches, Counter-Plaintiff has suffered damages, including lost compensation for his substantial additional work on the New Rebel Project, emotional distress, and damage to his professional reputation.

## COUNT III

## UNJUST ENRICHMENT

104.     Counter-Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 103 above as though fully set forth herein.

105.     Counter-Plaintiff conferred a benefit on Counter-Defendant by providing substantial original authorship and creative services for the New Rebel Project, far exceeding the scope of the Original Contract.

106.     Counter-Defendant had knowledge of this benefit and accepted and retained it.

107.     Counter-Defendant was enriched by Counter-Plaintiff's work, which added substantial scholarly credibility and value to the New Rebel Project and to Counter-Defendant's art collection.

108.     Counter-Defendant did not compensate Counter-Plaintiff for this substantial additional work. Counter-Plaintiff received only approximately $7,000 for basic editorial services under the Original Contract, a below-market fee even for the limited services originally contemplated.

109.     It would be inequitable for Counter-Defendant to retain the benefit of Counter-Plaintiff's work without providing just compensation.

110.    · Counter-Plaintiff is entitled to restitution for the reasonable value of his services.

## RESERVATION OF CLAIMS

Counter-Plaintiff expressly reserves all claims arising under the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq. ("NYCHRL"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"), and New York Labor Law § 740, including but not limited to claims for disability-based discrimination, hostile work environment, retaliation for protected activity, whistleblower retaliation, and aiding and abetting discrimination, for proceedings in the appropriate New York forum. The assertion of counterclaims herein is not intended to, and shall not, waive, relinquish, or otherwise prejudice any such claims, which arise under distinct statutory frameworks, implicate additional parties not before this Court, and are most appropriately adjudicated in New York, where the operative facts underlying those claims occurred and where the relevant statutory protections apply. Counter-Plaintiff's decision not to assert those claims as counterclaims in this action reflects a considered strategic and jurisdictional determination, not an abandonment or forfeiture of any rights, and Counter-Plaintiff reserves all rights to pursue such claims in full in the appropriate forum.

## PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff respectfully requests that this Court enter judgment in his favor as follows:

A.    Dismissing Plaintiff's Complaint with prejudice;

B.    On Counter-Plaintiff's Count I, entering a declaratory judgment that: (1) Counter-Plaintiff is the author and owner of copyright in his original works of authorship created in connection with the New Rebel Project; (2) Counter-Defendant has no copyright interest in Counter-Plaintiff's original works; and (3) Counter-Defendant's use of Counter-Plaintiff's works without authorization would constitute copyright infringement;

C.    On Counter-Plaintiff's Count I, enjoining Counter-Defendant from using Counter-Plaintiff's copyrighted works without authorization;

**D.**         On Counter-Plaintiff's Counts II and III, awarding Counter-Plaintiff damages for breach of contract and restitution, including lost compensation for Counter-Plaintiff's substantial additional work on the New Rebel Project;

**E.**         On Counter-Plaintiff's Count III, awarding Counter-Plaintiff restitution for the reasonable value of his services;

**F.**         Awarding Counter-Plaintiff his reasonable attorneys' fees and costs;

**G.**         Awarding Counter-Plaintiff pre-judgment and post-judgment interest; and

**H.**         Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Counter-Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 15, 2026

Respectfully submitted,

By: _____

Defendant and

Counter-Plaintiff Jorge Sánchez

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DANIEL BERGER,                          )
                                        )
    Plaintiff,                          )
                                        )
                                        ) Case No. 2025-cv-13361
- v -                                   )
                                        )
                                        )
JORGE SÁNCHEZ,                          )
                                        )
    Defendant.                          )
                                        )

## CERTIFICATE OF SERVICE

I, Jorge Sanchez, pro se, hereby certify that on February 15, 2026, I caused the following documents to be served upon counsel of record for Plaintiff via the Court's CM/ECF electronic filing system, which will send a Notice of Electronic Filing to all registered participants and also via regular mail & email:

1.    Defendant's Preliminary Statement, Answer, Affirmative Defenses, and Counterclaims;

2.    Defendant's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a); and

3.    Notice of Motion.

The above documents were served upon the following counsel of record:

Steven P. Mandell, Esq.
MANDELL P.C.
1 N. Franklin Street, Suite 900
Chicago, Illinois 60606
smandell@mandellpc.com

Dated: February 15, 2026

_____
Defendant and Counter-Plaintiff Jorge Sánchez

JORGE SANCHER
(787) 363-4833
APT 212
351 LEMONICK COURT
PRINCETON NJ 08540

1 LBS      1 OF 1
SHP WT: 1 LBS
DATE: 16 FEB 2026

SHIP
TO:  CLERKS OFFICE US DISTRICT COURT
     EASTERN DIVISION
     219 S DEARBORN ST

CHICAGO IL 60604-1702

IL 606 9-04

UPS GROUND

TRACKING #: 1Z W29 84Y 42 5157 1711

BILLING: P/P
SIGNATURE REQUIRED

MMH5MNSCRH2NQ ISH 13.0DC BIXOLON S 50.5V 12/2025

**Contents should be packed to ensure safe transportation.**

FOLD ON DOTTED LINE / PLIER SUR LE POINTILLÉ

